UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-20925-ALTMAN/Reid

WALTER COLEMAN, *et al.*,

     *Plaintiffs*,

*v.*

BURGER KING CORPORATION,

     *Defendant.*

_____/

## ORDER

The Defendant, Burger King Corporation, has moved to dismiss the Plaintiffs' Amended Complaint on various grounds. *See* Motion to Dismiss [ECF No. 20]. For the reasons set out below, the Motion to Dismiss is **GRANTED in part and DENIED in part**.

### THE FACTS

This is a class action against Burger King. The Plaintiffs' primary allegation is that Burger King, through its advertisements and in-store ordering boards, "materially overstates" the size of (and the amount of beef contained in) many of its burgers and sandwiches. Amended Complaint [ECF No. 18] ¶¶ 6–8, 11. So, for instance, the Plaintiffs claim that Burger King used to "more fairly advertise[ ] the size of the Whopper on its website and store menus." *Id.* ¶¶ 6–7. But, in September 2017, "Burger King began to materially overstate the size of its burgers in its advertisements." *Id.* ¶ 3. The Plaintiffs maintain that "[a] side-by-side comparison of Burger King's former Whopper advertisement to the current Whopper advertisement shows that the burger increased in size by approximately 35% and the amount of beef increased by more than 100%. Although the size of the Whopper and the beef patty increased materially in Burger King's advertisements, the amount of beef or ingredients contained in the actual Whopper that customers receive did not increase." *Id.* ¶¶ 8–9.

The named Plaintiffs are residents of—and bought Burger King products in—Florida, New York, Illinois, Massachusetts, Michigan, California, Connecticut, Ohio, Kentucky, Mississippi, Pennsylvania, and Arizona. *See* Amended Complaint ¶¶ 32–51. These Plaintiffs all claim that they bought Burger King burgers or sandwiches based on the representations Burger King made in its advertisements and ordering boards. *Ibid.* But, they continue, they were disappointed to discover that the burgers they bought came with much less meat than they'd expected. *Ibid.* They also insist that they wouldn't have bought the burgers or sandwiches if they'd known the food items were going to be smaller than advertised. *Ibid.* As relief, they request "monetary damages fully compensating all individuals who were deceived by Defendant as a result of purchasing Defendant's Overstated Menu Items" and "injunctive relief requiring Defendant to provide corrected advertising and/or to discontinue the Overstated Menu Items." *Id.* ¶ 31.

In its Motion, Burger King contends that "[f]ood in advertisements is and always has been styled to make it look as appetizing as possible. That is hardly news; reasonable consumers viewing food advertising know it innately. This lawsuit unreasonably pretends otherwise." Motion to Dismiss at 1. Burger King insists that it "makes very clear how much beef the Whopper contains." *Id.* at 2. As the company explains:

> BKC makes very clear how much beef the Whopper contains. "Our Whopper Sandwich is a ¼ lb* of savory flame-grilled beef topped with juicy tomatoes, fresh lettuce, creamy mayonnaise, ketchup, crunchy pickles, and sliced white onions on a soft sesame seed bun," with the asterisk after the burger's weight referring to the "[w]eight based on a pre-cooked patty." *See* https://www.bk.com/menu/picker-picker_5520. . . . . Plaintiffs do not and cannot contend that BKC delivered them less than a quarter pound of beef with any Whopper or Big King. They argue, instead, that they "expected" more beef, ostensibly because of the protruding patties in the pictures they included in the [Amended Complaint]. All of Plaintiffs' claims, however, fail to meet the objective requirement of reasonableness that is subject to judicial scrutiny at the pleading stage.

*Id.* at 2–3. Burger King thus asks us to dismiss all four of the Plaintiffs' claims.

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

### I.      Count I: Violation of State Consumer-Protection Laws

To comply with federal pleading standards, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Federal Rules also require plaintiffs to "state [their] claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 10(b). As the Eleventh Circuit has explained, a complaint is an impermissible "shotgun" pleading if it:

> (1) contains multiple counts where each count adopts the allegations of all preceding counts; (2) is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) fails to separate into a different count

3

each cause of action; or (4) asserts multiple claims against multiple defendants without specifying which defendant is responsible for which act.

*Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019). Count I of the Complaint plainly falls into this third category because the Plaintiffs "fail[ ] to separate into a different count each cause of action." *Ibid.*

The Plaintiffs' first cause of action lists—in a single paragraph that spans four pages—fifty different state (and DC) consumer-protection statutes. *See* Amended Complaint ¶ 73. The count then follows this prodigious list with one brief, conclusory allegation: "Defendant," the Plaintiffs say, "violated the above stated consumer protection laws by its deceptive practices and Plaintiffs and Class members were damaged as a result, the exact amount to be determined at trial." *Id.* ¶ 75. This won't do. The Plaintiffs "must separate each cause of action into a separate paragraph, and they must support each cause of action with specific (non-conclusory) factual allegations." *Brodowicz v. Walmart, Inc.*, 2022 WL 3681958, at *2 (S.D. Fla. June 6, 2022) (Altman, J.); *see also Davis v. Coast Dental Servs., LLC*, 2022 WL 4217141, at *3 (M.D. Fla. Sept. 13, 2022) (Barber, J.) ("Mixing causes of action and failing to separate them into separate counts is problematic because it muddles which facts go to which claims and prevents each claim from standing on its own merit before the Court."); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006) ("We [ ] remind district courts of their supervisory obligation to *sua sponte* order repleading pursuant to Federal Rule of Civil Procedure 12(e) when a shotgun complaint fails to link adequately a cause of action to its factual predicates.").

But that doesn't mean the Plaintiffs should file a second amended complaint that asserts fifty *separate* state consumer-protection claims—unless, of course, they can find a named plaintiff from every state. As we're about to explain, we think the named Plaintiffs *do* have standing to assert claims on behalf of absent class members from other states. But that's not to say that a named Florida plaintiff can assert a stand-alone count under, for instance, Georgia's consumer-protection statute—and on behalf of Georgia consumers—*without* having purchased the Defendant's products (or seen the

Defendant's ads) in Georgia. Such a count (it seems to us) would fail to state a viable claim under Rule 12(b)(6). To understand why, think of a Florida plaintiff who brings an action *only* on his own behalf for an injury he sustained when he bought the defendant's product in Florida. Imagine, too, that our hypothetical plaintiff decides to include two counts in his complaint: a FDUTPA count for the injury he sustained in Florida and a claim under Georgia's consumer-protection statute. The problem with the second count (as we'll soon see) *isn't* that our plaintiff lacks *standing* to bring it: He was, after all, injured by the defendant's deceptive practices, and a favorable decision would redress his grievances. The problem, rather, is that he'll have failed to meet the *requirements* of Georgia law—principally because he'll have failed to show any connection between his injury and any activity by the defendant in the State of Georgia.

So, too, here. Right now, our named Plaintiffs are asserting *only* their own claims. One day, we may allow them to assert the claims of unnamed class members from other states. But, as of today, they haven't been given that permission. So, they must file a second amended complaint that includes consumer-protection counts *only* for those states in which the named plaintiffs purchased their Burger King products. They may (and probably should) assert in some of those counts that, at some future date and time, they will be seeking court approval (what we call "certification") to assert materially identical consumer-protection claims on behalf of class members from *other* states, and they can even list in the named Plaintiffs' consumer-protection counts, the states whose consumer-protection statutes (they believe) are similar enough to justify certification. So, as an example, if the Florida Plaintiff believes that FDUTPA is materially identical to Georgia's consumer-protection statute, then he may assert a FDUTPA claim in which he may put us all notice of his intention, at some future date,

to represent the Georgia claims of Georgia class members based on *their* purchases of Burger King products in Georgia.[1]

Moving along, Burger King also contends that the Plaintiffs failed to plead the elements of two of the state statutory claims (Mississippi and Ohio). That's significant because two of the named Plaintiffs, Mr. Badgett and Mr. Mrofchak, have asserted claims under the Mississippi Consumer Protection Act ("MCPA") and the Ohio Deceptive Trade Practices Act ("ODTPA"), respectively. *See* Amended Complaint ¶¶ 42, 49, 73. As to Mr. Badgett, Burger King points out that, "[i]n any private action brought under [the MCPA], the plaintiff must have first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General." Motion to Dismiss at 11 (quoting MISS. CODE ANN. § 75-24-1, *et seq*.). And our review of the MCPA indeed reveals that "failure to satisfy the prerequisite of an attempt at informal dispute resolution is fatal to a MCPA claim." *Lockey v. CMRE Fin. Servs., Inc.*, 2011 WL 2971085, at *2 (S.D. Miss. July 20, 2011). Burger King also asks us to dismiss Mr. Mrofchak's claims under Ohio law because of *his* failure to allege the statutory elements. *See* Motion to Dismiss at 11. But the Sixth Circuit case Burger King relies on interprets the Ohio Consumer Sales Practices Act, *not* the ODTPA. *See ibid.* (citing *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 680 (6th Cir. 2017)). In either event, the Plaintiffs concede that they've failed to meet the requirements of Mississippi and Ohio law—even as they ask us not to dismiss those claims. *See* Plaintiffs' Response to the Motion to Dismiss [ECF No. 24] at 8 n.3 (asking us not to "dismiss claims for violations of Ohio and Mississippi consumer protection statutes that have not yet been technically complied with at this time"). Since the Plaintiffs don't explain why we should ignore

---

[1] One more thing: Nothing in this Order should be seen as precluding the named Plaintiffs from *trying* to assert a nationwide FDUTPA claim (if they think such a claim viable) based on allegations that, from its headquarters in Florida, Burger King disseminated throughout the whole country its allegedly deceptive communications. We say "try" because, as we'll explain in a moment, we don't think the Plaintiffs have advanced a nationwide FDUTPA claim in the Amended Complaint at issue here.

the strictures of Mississippi and Ohio law, we'll dismiss these two claims for the *additional* reason that they fail to comply with the MCPA and the ODTPA.

Two more things before we leave Count I. *First*, as we've hinted, we decline the Defendant's invitation to dismiss some of the Plaintiffs' consumer-protection claims for lack of standing—at least for now. Burger King says that the Plaintiffs "lack standing to assert claims under any state's law but their own because they did not suffer any injuries in fact traceable to alleged violations of laws in other states." Motion to Dismiss at 10 (cleaned up). Burger King therefore asks us to "dismiss Plaintiffs' claims asserted under the laws of states in which they do not reside." *Ibid.* Our Circuit's more recent jurisprudence, however, has shown that the authority of a named plaintiff to represent the interests of absent class members is better analyzed through the prism of Rules 12 and 23—and *not* as a question of standing. As the Eleventh Circuit has explained:

> [A]ll circuits which have addressed whether a plaintiff can represent unnamed class members whose claims fall under different states' laws have concluded that it is a question that concerns Rule 12(b)(6) or Rule 23—not Article III. A leading class action treatise is of the same view. *See* William B. Rubenstein, 1 Newberg on Class Actions § 2:6 (5th ed. & Dec. 2021 update) ("[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class.") . . . . For class representation purposes, the claims that the plaintiffs made on behalf of class members who [reimbursed purchases of ranitidine products in other states] need not be stricken or disregarded, as those claims may be considered when determining the appropriateness of class certification under Rule 23.

*In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2022 WL 16729170, at *5–6 (11th Cir. Nov. 7, 2022) (cleaned up); *see also Haynes v. Walmart, Inc.*, 2021 WL 5811732, at *4 (N.D. Ala. Dec. 6, 2021) ("[W]hen class certification is the source of the potential standing problems, the best approach is to treat class certification as 'logically antecedent' to standing . . . . [The] [p]laintiffs do not purport to seek relief for themselves under the laws of any state in which they neither reside nor were harmed in. Instead, the standing issue arises only because of [p]laintiffs' attempt to represent a class similarly harmed by Walmart. Determining whether [p]laintiffs' injuries are sufficiently similar to those of the purported

class is a question for the certification stage. Fed. R. Civ. P. 23(b)(3). So the certification issue is 'logically antecedent' to the standing issue." (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999))).

And that makes sense to us. To establish his standing, after all, a plaintiff must show only that: (1) he suffered an "injury in fact," (2) the injury was fairly traceable to the challenged action of the defendant, and (3) it's likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Our named Plaintiffs have met each of these elements as to *their own claims*. At this stage, remember, the Plaintiffs have brought only a putative (which is to say, an aspirational) class action. As things stand today, therefore, they represent only their own claims and are proceeding for redress only as to their own injuries. One day, we'll allow them to seek certification of a broader class of interests. And, when they request that certification, we'll have to decide whether they can assert the claims of absent class members from other states. But that day is not today.

The Defendants (notably) don't challenge the standing of our named Plaintiffs *vis-à-vis* their own claims, *see generally* Motion to Dismiss—principally because each of these Plaintiffs claims to have suffered an injury in fact that was caused by the Defendant and which would be redressable by the relief the Plaintiffs have sought. *See, e.g.*, Amended Complaint ¶ 32 ("Plaintiff Walter Coleman is a resident of the state of Florida. During the Class Period . . . Mr. Coleman purchased a Whopper and a Big King at a Burger King store located in the state of Florida. Mr. Coleman expected the burgers that he purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board. However, the size of the burgers that Mr. Coleman received were much smaller than advertised and he was financially damaged as a result. If Mr. Coleman knew that said burgers were much smaller than advertised, he would not have purchased the burgers."). Whether—and to what extent—these named Plaintiffs will be able to represent the claims of absent class members from other states (which is to say, whether they will have stated a viable claim

8

for purposes of Rule 12 and whether their claims will be typical and representative of the claims of absent class members under Rule 23) is a question we will resolve *either* on a motion under Rule 12(b)(6) *or* at the class-certification phase of this case. *See Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1230 (S.D. Fla. 2015) (Bloom, J.) ("[T]he issue is not whether the named plaintiff has standing to sue the defendant, but whether his or her injuries are sufficiently similar to those of the purported class to justify the prosecution of a nationwide class action, which is properly determined at the class certification stage, when the court may consider commonality and typicality issues with respect to the named plaintiffs and other putative class members." (cleaned up)).

We recognize, of course, that some of our colleagues have gone the other way on this issue. *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 1266609, at *4 (S.D. Fla. Mar. 11, 2016) (Moreno, J.) ("A named plaintiff lacks standing to assert legal claims on behalf of a putative class pursuant to state law under which the named plaintiff's own claims do not arise."); *Feldman v. BRP US, Inc.*, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018) (Dimitrouleas, J.) ("[N]amed plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises."); *Inouye v. Adidas Am., Inc.*, 2023 WL 2351654, at *5–6 (M.D. Fla. Mar. 3, 2023) (Covington, J.) ("Courts have found Article III standing lacking where, at the motion to dismiss stage, a plaintiff brings claims under various state statutes on behalf of unnamed, putative plaintiffs. . . . . [B]ecause Mr. Inouye does not have standing to assert claims on behalf of future, hypothetical plaintiffs, his state statutory claims based on the law of states in which he does not reside are dismissed without prejudice."); *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1325 (S.D. Fla. 2010) (King, J.) ("Plaintiffs may only assert a state statutory claim if a named plaintiff resides in that state. The Court notes that this does not resolve the issue of class certification or representation; whether Plaintiffs have named proper class representatives will be considered at a later date. For now, the Court merely announces the same rule that applies in every case: each claim must have a named

plaintiff with constitutional standing to assert it. Therefore, all state statutory claims where no named plaintiff resides in the state from which the claim is asserted are hereby dismissed without prejudice."); *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1205 (S.D. Fla. 2021) (Ruiz, J.) (same). With due respect to our colleagues, however, the Eleventh Circuit made clear in its recent *Zantac* opinion that a named plaintiff's authority to assert claims on behalf of unnamed class members *doesn't* raise questions of *standing* that should be decided *at the pleading stage*.

We recognize, too, that, in deciding whether a named plaintiff has standing to pursue the claims of out-of-state class members, some of our colleagues have tried to distinguish between state common-law and state statutory claims. For two reasons, we don't think that distinction works very well. For one thing, many states have now codified their more traditional common-law claims. Our own State of Florida, for instance, has codified by statute our common-law claims of wrongful death, *see* FLA. STAT. § 768.20, for quiet title, *see* § FLA. STAT. § 65.061, and of premises liability, *see* FLA. STAT. § 768.0755—among many others. As a conceptual matter, then, it no longer makes much sense to think of these (traditionally) common-law claims as distinct from a state's body of statutory law. For another, whether a plaintiff has asserted a state common-law claim or a state statutory claim, the cause of action is still a creature of state law. Fairly put, then, the question isn't whether a plaintiff in Florida has standing to represent the common-law (as opposed to the statutory) claims of absent Georgians. The question is whether a Florida plaintiff has standing to assert the claims of absent Georgians at all—whatever those claims happen to be. As we've said, we think he can—at least for purpose of a motion to dismiss and in the circumstances presented here.

*Second*, Burger King points out that the Plaintiffs act in their Response as if they'd asserted a nationwide FDUPTA claim in their Amended Complaint.[2] Burger King is right about that. In their

---

[2] *See* Defendant's Reply in Support of its Motion to Dismiss (the "Reply") [ECF No. 27] at 2 ("Although Plaintiffs' [Amended Complaint] pleads claims under the different consumer fraud laws

Response, for example, the Plaintiffs say that "FDUTPA applies equally for every putative class member throughout the United States because Defendant is a Florida corporation and the offending conduct took place predominantly in Florida." Response at 5. And the Plaintiffs insist that their Amended Complaint advances FDUTPA claims "on behalf of a proposed nationwide class." *Ibid.* But, because the Plaintiffs failed to separate and support each cause of action with non-conclusory factual allegations, we simply can't tell if that's true. Besides, our reading of the Amended Complaint leads us to conclude that the Plaintiffs did *not* in fact claim that "FDUTPA applies equally for every putative class member throughout the United States[.]" Instead, the Amended Complaint seems to allege that Burger King separately violated *every state's* consumer-protection law. *See* Amended Complaint ¶¶ 73–75 ("*Each of the fifty states* and the District of Columbia have enacted *statutes* designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. . . . The Overstated Menu Items, marketed and sold by Defendant, constitute products to which these consumer protection *laws* [plural] apply. Defendant violated the above stated consumer protection *laws* [plural] by its deceptive practices and Plaintiffs and Class members were damaged as a result, the exact amount to be determined at trial." (emphases added)). And the Plaintiffs cannot amend their Amended Complaint through their Response. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is limited to the four corners of the complaint."); *Tsavaris v. Pfizer, Inc.*, 2016 WL 375008, at *3 (S.D. Fla. Feb. 1, 2016) (Moore, C.J.) ("A plaintiff [ ] cannot amend the complaint in a response to a motion to dismiss, for a court's review on dismissal is limited to the four corners of the complaint."). Because the Plaintiffs

---

of every state in the Union, they seem to have rethought that strategy and now have shifted gears to argue that all guests of Burger King restaurants nationwide, who saw unspecified advertisements in unspecified places, can sue BKC under [FDUTPA].").

advanced their nationwide FDUTPA claim only in their Response—and since that claim doesn't appear anywhere in their Amended Complaint—we won't consider it here.

We, therefore, **GRANT** the Motion to Dismiss Count I *without* prejudice and *with* leave to amend.

## II.       Count II: Breach of Contract

The Defendant also moves to dismiss Count II (the breach-of-contract claim). "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). "For an agreement to be binding, mutual assent as to all essential terms is required. . . . . The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *CFTC v. Vision Fin. Partners*, 232 F. Supp. 3d 1287, 1293 (S.D. Fla. 2017) (Cohn, J.) (cleaned up). Burger King contends that the parties failed to assent to the essential terms of the contract because "reasonable consumers" do not "expect every hand-made burger to look exactly like an advertising photo." Motion to Dismiss at 15. "To prevail," Burger King says, the "Plaintiffs would have to prove that the advertising photo of a burger constituted a contractual offer by BKC that included as an 'essential term' delivery of a handcrafted sandwich looking exactly like the picture." *Id.* at 17. The Plaintiffs counter that "Burger King made an offer through its advertisements and provided specification of the essential terms, which were actual photographs of what the products looked like, and Plaintiffs accepted and purchased the Menu Items based on the essential terms of the offers." Response at 20. The "Plaintiffs allege that they would not have purchased the Menu Items if they had known that they were much smaller than advertised." *Id.* at 4.

The Plaintiffs have adequately pled the existence of a valid contract. In *Williams v. Burger King Corp.*, 2020 WL 5083550 (S.D. Fla. July 20, 2020), Judge Singhal (of our Court) found, on a motion to

dismiss, that the plaintiffs had plausibly pled the existence of an express contract, where they alleged that they had purchased certain "Impossible" (*i.e.*, plant-based) burgers from the Burger King menu: "Burger King made an offer (the ad for the 'Impossible Burger')," Judge Singhal wrote, "which Plaintiffs accepted (by ordering the 'Impossible Burger'), consideration was exchanged (Plaintiffs' money for the 'Impossible Burger'), and the essential terms were clear. Thus, this Court must conclude the parties had an express contract." *Id.* at *3. That's precisely what the Plaintiffs have alleged here— and we agree with Judge Singhal that these allegations are sufficient (for now) to plead the existence of a valid contract.

In its Motion to Dismiss, Burger King suggests that its advertisements were *not* binding offers. In the Defendant's words:

> Plaintiffs' "breach of contract" claims fare no better. Paragraph 79 of Plaintiffs' FAC introduces the term "sales contracts" without defining it. They seem to argue that advertising photos amounted to a contractual "offer" to sell a burger looking exactly like the photo. FAC ¶ 77. The supposed "breach" occurred by delivery of sandwiches that "were smaller than advertised." *Id.* ¶ 80. But, Plaintiffs identify no advertisements in which BKC promised a burger "size" (i.e., patty weight) and failed to deliver it. The FAC is purely about aesthetics.

Motion to Dismiss at 17. We acknowledge that, generally speaking, advertisements are merely "solicitations to bargain," *not* offers. *Armour Grp., Inc. v. Labock*, 2012 WL 12837289, at *7 (S.D. Fla. Mar. 26, 2012) (Dimitrouleas, J.). So, we agree with Burger King that a reasonable person wouldn't have interpreted Burger King's TV and online ads as binding offers. As we've said, "courts generally consider it *unreasonable* for a person to believe that an advertisement constitutes a binding offer." *Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1312 (S.D. Fla. 2020) (Altman, J.) (emphasis added); *see also Armour Grp.*, 2012 WL 12837289, at *7 (holding that online advertisements were not offers because there was "no purchase information, no price, and no description of the product that would be received if a visitor was interested," so "viewers of these advertisements would have reason to know that the [d]efendants did not 'intend to conclude a bargain until [the defendants had] made a further

manifestation of assent'" (quoting Restatement (Second) of Contracts § 26 (1981))). We therefore **GRANT** the Motion to Dismiss to the extent it seeks to preclude the Plaintiffs from relying on these out-of-stores ads as the basis for their breach-of-contract claim.

But the same can't be said of Burger King's *in-store* "menu ordering boards." Amended Complaint ¶ 4. Our cases are clear that an advertisement *can* become an offer if a "reasonable person" would have thought that "the advertisement or solicitation was intended as an offer." *Schultz v. Am. Airlines, Inc.*, 2018 WL 7287194, at *3 (S.D. Fla. Sept. 25, 2018) (Reinhart, Mag. J.), *report and recommendation adopted*, 2018 WL 7287149 (S.D. Fla. Oct. 11, 2018) (Rosenberg, J.). These in-store ordering boards—unlike BKC's TV and online ads—*do* list price information and *do* provide item descriptions. *See* Amended Complaint ¶ 4 (inserting a picture of, and including a hyperlink to, an alleged Burger King menu-ordering board). Plus, these ordering boards aren't advertisements at all. So far as we can tell, these ordering boards are actually *in the stores* when the customers walk in. Their whole purpose is to present to the potential customer an offering of the available menu items (and their prices). They're thus very different from the advertisements one might see on the Internet or on TV—which cannot constitute offers precisely because they cannot promise that the item will still be available when, at some future date and time, the customer finally elects to walk into the store. "A customer," as one treatise explains, "would not usually have reason to believe that the shopkeeper intended exposure to the risk of a multitude of acceptances resulting in a number of contracts exceeding the shopkeeper's inventory." E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.10, at 260–61 (3d ed. 2004). That's not a concern with the menu boards (obviously) because those boards, by definition, are only subject to acceptance by the handful (or so) of customers who are actually *in the store* looking to purchase a sandwich.

And, since the Plaintiffs say that they relied on the information on those "store menu ordering boards," Amended Complaint ¶¶ 32–51,[3] we'll accept (for now) those ordering boards as offers. Recall that, "[f]or the purposes of a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true." *S.M. v. Feaver*, 2004 WL 213198, at *2 (S.D. Fla. Jan. 22, 2004) (Hurley, J.). Taking the Plaintiffs' factual allegations as true—and construing them in the light most favorable to the Plaintiffs—we conclude that a reasonable person *could have* viewed Burger King's in-store depictions of its menu items as offers, and *not* merely as invitations to bargain.

Burger King also maintains that a sandwich's *appearance* isn't an essential term of a contract. *See* Motion to Dismiss at 17 ("To prevail, Plaintiffs would have to prove that the advertising photo of a burger constituted a contractual offer by BKC that included as an 'essential term' delivery of a handcrafted sandwich looking exactly like the picture . . . . Plaintiffs [ ] have to show a meeting of the minds between BKC and its guests that BKC would deliver every sandwich looking exactly like the picture in a particular ad."). How can that be? We won't lightly suppose that a proprietor can offer to sell you a certain amount of food at a specified price only to provide you with less food for the same price. Nor will we simply assume that most reasonable people would take lying down this incongruity between the amount of sustenance they were promised and the amount of sustenance they got. We'll agree with Burger King (of course) that most reasonable people would be unfazed by, say, a one-percent disparity between the amount of food they were offered and the amount they ultimately received—just as (we would think) Burger King would concede that a fifty-percent delta between what was promised and what was sold would probably vex most reasonable consumers. In our case, the

---

[3] *See also* Response at 20 ("Plaintiffs allege that Burger King made an offer through its advertisements and provided specification of the essential terms, which were actual photographs of what the products looked like, and Plaintiffs accepted and purchased the Menu Items based on the essential terms of the offers.").

Plaintiffs allege, for instance, that "[a] side-by-side comparison of Burger King's former Whopper advertisement to the current Whopper advertisement shows that the burger increased in size by approximately 35% and the amount of beef increased by more than 100%," *without* any concomitant increase in the actual size of the burgers. Amended Complaint ¶¶ 8–9. Who are we to decide whether such a seemingly substantial difference between what was promised and what was sold was (or was not) enough to alter the purchasing preferences of reasonable American consumers? Far better, it seems to us, to leave that determination to the consumers themselves, who—if the case survives that far—will get to sit in the jury box and *tell us* what reasonable people think on the subject.

Ultimately, the Plaintiffs allege that they purchased Burger King products on the expectation that those items would resemble the images "on Burger King's store ordering board." *Id.* ¶ 32. They also allege that they received items that were materially "smaller than advertised," and that they wouldn't have purchased those items had they known their true size. *Id.* ¶¶ 32–51. That's enough for now.

Burger King points out that Judge Singhal came to a different conclusion in *Williams*. *See* Motion to Dismiss at 17–18. In *Williams*, the plaintiffs alleged that "they were misled into believing the 'Impossible' plant-based patty in Burger King's 'Impossible Whopper' sandwich . . . would be flame broiled on a different grill than the one used to cook beef and chicken." 2020 WL 5083550, at *1. Judge Singhal concluded that the plaintiffs' "presumption the 'Impossible' patties would be cooked on a different grill than other items sold at Burger King" was "not an essential term of the contract," because the plaintiffs "could have '[h]ad it [their] way' by requesting a different cooking method, thereby altering the terms of the contract." *Id.* at *3. Our case is different. Our Plaintiffs don't take issue with *where* or *how* certain foods were prepared—nor are they carping about assumptions *they* made that ultimately turned out to be unfounded. Burger King, remember, had never promised the *Williams* plaintiffs that their burgers would be cooked on a different grill; the plaintiffs in that case had simply

assumed that they would be. Unlike the plaintiffs in Judge Singhal's case, in other words, our Plaintiffs allege that, after entering into valid contracts for the exchange of some specific items, they were ultimately given *different* (and materially worse) items. *See* Response at 20 ("Plaintiffs' claims are not based on a failure to provide a Menu Item that looked exactly like the advertised picture but a failure to provide a product of similar size to what was represented."). That's sufficient to survive a motion to dismiss.

We therefore **DENY** the Defendant's Motion to Dismiss Count II—*except* that we'll preclude the Plaintiffs from arguing that Burger King's TV and online ads constituted actionable offers.

### III.    Count III: Negligent Misrepresentation

To prevail on a claim of negligent misrepresentation under Florida Law, "a plaintiff must demonstrate: (1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation." *Fojtasek v. NCL (Bahamas) Ltd.*, 613 F. Supp. 2d 1351, 1355 (S.D. Fla. 2009) (Ungaro, J.) (citing *Wallerstein v. Hosp. Corp. of Am.*, 573 So. 2d 9, 10 (Fla. 4th DCA 1990)). "[A]lthough justifiable reliance on the misrepresentation is required as an element of [a negligent-misrepresentation] claim, justifiable reliance on a representation is not the same thing as failure to exercise due diligence." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). That is, "a recipient of an erroneous representation cannot 'hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error.'" *Ibid.* (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997)).

The Plaintiffs allege that, through its advertisements, Burger King "offered Overstated Menu Items" based on "false representations, concealments, and nondisclosures to Plaintiffs and members

of the Class." Amended Complaint ¶¶ 83–84. "Defendant, in making the misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the representations were not true." *Id.* ¶ 89. "Defendant made and intended the misrepresentations to induce the reliance of Plaintiffs and members of the Class to purchase an Overstated Menu Item." *Id.* ¶ 85. And, "[a]s a result of Defendant's wrongful conduct, Plaintiffs and members of the Class have suffered damages, the exact amount to be determined at trial." *Id.* ¶ 91.

"Claims for negligent misrepresentation must be pled to meet the particularity standard required by Rule 9(b) for fraud claims because, in Florida, negligent misrepresentation sounds in fraud." *SIG, Inc. v. AT&T Dig. Life, Inc.*, 971 F. Supp. 2d 1178, 1196 (S.D. Fla. 2013) (Rosenbaum, J.). To satisfy Rule 9(b), a complaint "must set forth particular allegations about the who, what, when, where, and how of the fraud." *Woodley v. Royal Caribbean Cruises, Ltd.*, 472 F. Supp. 3d 1194, 1206 (S.D. Fla. 2020) (Moore, C.J.). Our Plaintiffs have met this standard here: In addition to the allegations we've highlighted above, they claim that they bought specific Burger King food items at Burger King stores in their resident states, and that they were duped by the promotional images of the burgers they saw online, on TV, and on Burger King's menu-ordering boards. *See* Amended Complaint ¶¶ 32–51. They also allege that every class member "purchased an Overstated Menu Item" sometime after September 1, 2017. *Id.* ¶ 56. And they identify what they believe to be the salient misrepresentations: images of the burgers and sandwiches displayed on Burger King's "website and store menu ordering boards." *Id.* ¶ 4. Based on these allegations, we find that the Plaintiffs have adequately (if just barely) pled a cause of action for negligent misrepresentation because they've given us the *who* (Burger King), *what* (oversized images of the burgers), *when* (after September 1, 2017), *where* (online, on TV, and in stores), and *how* (advertising and in-store misrepresentations about the size of the menu items) of the misstatements.

Burger King contends that the "Plaintiff's negligent misrepresentation claim fails . . . because no 'special relationship' exists between BKC and plaintiffs imposing an extraordinary duty of care on BKC." Motion to Dismiss at 19. But Florida law doesn't require plaintiffs to establish a special relationship as an element of their negligent-misrepresentation claims. On the contrary, courts applying Florida law consistently hold that a claim of negligent misrepresentation has only four elements: (1) that the defendant misrepresented a material fact; (2) that the representor was negligent in making the statement because he should have known the representation was false; (3) that the representor intended the misrepresentation to induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation. *See, e.g.*, *Wallerstein*, 573 So. 2d at 10; *Dziegielewski v. Scalero*, 352 So. 3d 931, 934 (Fla. 5th DCA 2022); *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 653 (Fla. 3d DCA 2006). Notably absent from this list of elements is any requirement of a special relationship between the plaintiff and the defendant.

And that makes sense. The Florida Supreme Court, after all, has expressly "adopt[ed] the Restatement (Second) of Torts' position on negligent misrepresentation contained in section 552." *Gilchrist Timber*, 696 So. 2d at 339. The Restatement provides, in pertinent part, as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

    a. by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

    b. through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977). Adopting the Restatement, Florida courts have established that "the central principle operating within section 552 is that the defendant supplier of information must have a pecuniary interest in the transaction or context in which the information is supplied in order to merit the imposition of a duty of care in obtaining and communicating the information." *Blumstein v. Sports Immortals, Inc.*, 67 So. 3d 437, 441 (Fla. 4th DCA 2011); *see also FLA Orthopedics, Inc. v. Am. Ins. Co.*, 896 So. 2d 1, 4 (Fla. 3d DCA 2004) (concluding that the plaintiff could not establish its claim of negligent misrepresentation (in part) because the defendant "had no pecuniary interest in its insured's transactions with [the plaintiff]").

Crucially for our purposes, at least one Florida court has *distinguished* Florida law on negligent misrepresentation from the law of the State of New York, where a "special relationship" *is* an element of a negligent-misrepresentation claim. *See Blumstein*, 67 So. 3d at 441 n.2 ("New York has gone a step further and narrowed the tort of negligent misrepresentation by requiring the existence of a 'special relationship' between the person making the negligent statement and the plaintiff[.]"). The Defendant seems to concede that it had a pecuniary interest in its transactions with the Plaintiffs, *see* Motion to Dismiss at 18–19, and it never suggests that, as Burger King customers, the Plaintiffs weren't part of "a limited group of persons for whose benefit and guidance [Burger King] intend[ed] to supply the information," Restatement (Second) of Torts § 552. Florida law (as articulated in the Restatement) requires nothing more.[4]

---

[4] Burger King may have forfeited this argument in any event because it fails to cite a single relevant case for its position. In its Motion to Dismiss, Burger King relies on a handful of non-binding cases from New York, the Second Circuit, and the Central District of California. As we've said, however, Florida law differs in salient ways from New York law on the need for a special relationship. *See Blumstein*, 67 So. 3d at 441 n.2 ("New York has gone a step further [than Florida] and narrowed the tort of negligent misrepresentation by requiring the existence of a 'special relationship' between the person making the negligent statement and the plaintiff[.]"). And Burger King simply misinterprets the state of California law on this issue. *See Byrum v. Brand*, 219 Cal. App. 3d 926, 941 (Cal. Ct. App. 1990) (holding that "negligent misrepresentation is a claim which may be made in any type of relationship"). Burger King *does* cite one case from our District: *Thompson v. Procter & Gamble Co.*, 2018

We, therefore, **DENY** the Motion to Dismiss Count III.

## IV.    Count IV: Unjust Enrichment

The Plaintiffs assert that the "Defendant has been unjustly enriched at the expense of Plaintiffs and members of the Class, and thus Plaintiffs and members of the Class were unjustly deprived of time and value of money provided to Defendant." Amended Complaint ¶ 93. The Plaintiffs "seek restitution from Defendant, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct." *Id.* ¶ 95.

"The general rule in Florida is that a plaintiff cannot pursue an equitable remedy, such as a claim for unjust enrichment, 'where an express contract exists concerning the same subject matter.'" *Quantum Supply B.V. v. Mercury Air Cargo Inc.*, 2021 WL 1125017, at *2 (S.D. Fla. Mar. 24, 2021) (Bloom, J.) (quoting *Kovtan v. Frederiksen*, 449 So. 2d 1, 1 (Fla. 2d DCA 1984)). A claim for unjust enrichment is thus "precluded by the existence of an express contract between the parties concerning the same subject matter." *Ibid.* (cleaned up). "The principle that unjust enrichment is preempted by contract has been described as 'settled law' and is followed universally in both federal and state courts." *Carrera v. UPS Supply Chain Sols., Inc.*, 2012 WL 12860910, at *7 (S.D. Fla. Sept. 21, 2012) (Lenard, J.) (cleaned up).

At the same time, the law is well-established that plaintiffs may plead claims in the alternative. *See Block v. Matesic*, 2023 WL 3816693, at *5 (S.D. Fla. June 5, 2023) (Altman, J.) ("[P]leading in the alternative is permissible in federal court."); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir.

---

WL 5113052 (S.D. Fla. Oct. 19, 2018) (Gayles, J.). But, as the Plaintiffs correctly note, *Thompson* "does not hold that a special relationship is required." Response at 20 n.10. Since "[t]he failure to make arguments and cite authorities in support of an issue waives it," *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012), Burger King has probably forfeited this issue for now. Still, because we're allowing the Plaintiffs to file a second amended complaint—which (we presume) will include a cause of action for negligent misrepresentation—the Defendant may re-raise this issue in a subsequent motion to dismiss, *but only if* it finds Florida-law cases to support its position.

2009) ("Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims."). So, while we've determined that the Plaintiffs have pled a viable breach-of-contract claim *for now*, we haven't yet concluded that their contract claim will ultimately prevail. Burger King, in fact, may (and probably will) contest the viability of the Plaintiffs' contract claim—indeed, Burger King will continue to dispute the existence of a contract in the first instance— through summary judgment and (if we get that far) trial. There is, in sum, nothing wrong with a plaintiff who asserts a contract claim in count 1 and, in the alternative that no such contract is found to have existed, an unjust-enrichment claim in count 2. *See Rosado v. Barry Univ. Inc.*, 499 F. Supp. 3d 1152, 1160 (S.D. Fla. 2020) (Martinez, J.) ("Although it is well established that an unjust enrichment claim cannot be maintained when there is an express contract with a legal remedy . . . it is equally clear that a plaintiff may assert a claim for unjust enrichment as an alternative to a contract claim.").

We, therefore, **DENY** the Motion to Dismiss Count IV.

CONCLUSION

For all these reasons, we **GRANT** the Motion to Dismiss [ECF No. 20] *without prejudice* and *with leave to amend* as to Count I. We also **GRANT** the Motion to Dismiss to the extent that the Plaintiffs attempt to rely on Burger King's online and TV ads as a basis for their contract claim in Count II. The Motion to Dismiss is otherwise **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on August 23, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record