**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-cv-20925-ALTMAN/Reid**

**WALTER COLEMAN**, *et al.*,

    *Plaintiffs*,

*v.*

**BURGER KING CORPORATION**,

    *Defendant.*

_____/

## ORDER DENYING MOTION TO DISMISS

Nineteen Plaintiffs—hailing from thirteen separate states—have brought this putative class action "against defendant Burger King Corporation [("BKC")], on behalf of themselves and all other similarly situated individuals who purchased a Burger King menu item based on false and misleading advertising concerning the size and/or the amount of ingredients contained in said menu item." Second Amended Complaint ("SAC") [ECF No. 69] ¶ 1. For the second time, BKC has moved to dismiss the SAC under FED. R. CIV. P. 12(b)(6). *See* Motion to Dismiss SAC ("MTD") [ECF No. 70].[1] After careful review, we **DENY** BKC's MTD.

### THE FACTS

According to the Plaintiffs, BKC "began to materially overstate the size of its burgers in its advertisements in September 2017." *Id.* ¶ 6. BKC, the Plaintiffs claim, "advertises its burgers as large burgers compared to competitors and containing oversized meat patties and ingredients that overflow over the bun to make it appear that the burgers are approximately 35% larger in size, and contain

---

[1] The MTD has been fully briefed and is ripe for adjudication. *See* Opposition to BKC's Motion to Dismiss SAC ("Response") [ECF No. 73]; Reply Memorandum in Support of Motion to Dismiss SAC ("Reply") [ECF No. 75].

more than double the meat, than the actual burger." *Id.* ¶ 3. Despite the increased size of the burgers BKC featured in its post-2017 advertisements, the Plaintiffs allege that "the amount of [ingredients] contained in the actual [products] that customers receive did not increase." *Id.* ¶ 9. To illustrate BKC's "unfair and materially misleading advertising," the Plaintiffs provide these side-by-side comparisons of actual BKC products to the advertisements BKC displayed online and in stores:

**ACTUAL WHOPPER**                    **CURRENT ADVERTISEMENT**

 

**ACTUAL BIG KING**                    **CURRENT ADVERTISEMENT**

 

*Id.* ¶¶ 10, 12. And, to emphasize the differences between BKC's advertisements and its products, much of the SAC reproduces negative reviews that were posted online by dissatisfied consumers. *See generally id.* ¶¶ 13–31.

Each of our Plaintiffs purchased BKC products at Burger King stores in their home states, and each came away disappointed by the incongruity between what they received and what they expected based on BKC's advertisements. *See, e.g., id.* ¶ 32 ("Mr. Coleman purchased a Whopper and a Big King at a Burger King store located in the state of Florida. Mr. Coleman expected the burgers that he purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board. However, the size of the burgers that Mr. Coleman received were much smaller than advertised and he was financially damaged as a result. If Mr. Coleman knew that said burgers were much smaller than advertised, he would not have purchased the burgers.").

In adjudicating BKC's first motion to dismiss, *see generally* First Motion to Dismiss [ECF No. 20], we agreed with BKC that Count I of the Amended Complaint violated federal pleading standards because the Plaintiffs tried to cram "fifty different state (and DC) consumer-protection statutes" into one cause of action. *Coleman v. Burger King Corp.*, 2023 WL 5507730, at *2 (S.D. Fla. Aug. 25, 2023) (Altman, J.). We also found that—unless and until we certified a class—the Plaintiffs could assert "consumer-protection counts *only* for those states in which the named plaintiffs purchased their Burger King products." *Id.* at *3.[2] We therefore dismissed Count I of the Amended Complaint

---

[2] At the same time, we refused to dismiss the Plaintiffs' claims for lack of standing and explained that we would revisit the questions surrounding the Plaintiffs' standing once we decided whether class certification was appropriate. *See Coleman*, 2023 WL 5507730, at *4 ("Our named Plaintiffs have [standing] as to *their own claims*. At this stage, remember, the Plaintiffs have brought only a putative (which is to say, an aspirational) class action. As things stand today, therefore, they represent only their own claims and are proceeding for redress only as to their own injuries. One day, we'll allow them to seek certification of a broader class of interests. And, when they request that certification, we'll have

"without prejudice and with leave to amend." *Id.* at *6. As for Count II, we agreed with BKC that the Plaintiffs couldn't advance a breach-of-contract claim based on BKC's "out-of-stores ads" since "courts generally consider it unreasonable for a person to believe that an advertisement constitutes a binding offer." *Id.* at *7 (quoting *Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1312 (S.D. Fla. 2020) (Altman, J.)). But we still allowed Count II to survive on the theory that BKC's "in-store 'menu ordering boards'" were "very different from the advertisements one might see on the Internet or on TV" and could constitute an "offer" under contract law. *Ibid.* Finally, we denied BKC's request that we dismiss Counts III and IV—which asserted common-law claims of negligent misrepresentation and unjust enrichment under Florida law. *See id.* at *11.

The Plaintiffs responded to our order with the SAC, which contains fourteen counts. Counts 1 through 11 allege that BKC's "deceptive, false and misleading" advertisements—which "materially inflate the size" of their products—violate the consumer-protection laws of eleven different states: Florida (Count 1), New York (Count 2), California (Count 3), Illinois (Count 4), Arizona (Count 5), Connecticut (Count 6), Massachusetts (Count 7), Michigan (Count 8), New Jersey (Count 9), Kentucky (Count 10), and Pennsylvania (Count 11). *See generally* SAC ¶¶ 70–224. Counts 12, 13, and 14 reassert the same breach-of-contract, negligent-misrepresentation, and unjust-enrichment claims that had formed the basis of Counts II, III, and IV of the Amended Complaint. *See id.* ¶¶ 225–244.

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the

---

to decide whether they can assert the claims of absent class members from other states. But that day is not today.").

reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). And the "moving party bears the burden to show that the complaint should be dismissed." *Spring Solutions, Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1229 (S.D. Fla. 2014) (Cohn, J.) (quoting *Mendez-Arriola v. White Wilson Med. Ctr., P.A.*, 2010 WL 3385356, at *3 (M.D. Fla. Aug. 25, 2010) (Rodgers, J.)).

## ANALYSIS

### I.     The Consumer-Protection Claims (Counts 1–11)

Although the first eleven counts of the SAC rely on different states' consumer-protection statutes, BKC says that we should dismiss all of them for two reasons. *First*, in BKC's view, the Plaintiffs haven't (and can't) show that a "reasonable consumer" would be duped by BKC's promotional photos because "[s]tyling ingredients for photographic purposes, such as by pulling them forward so a head-on image clearly shows what the burger contains, is not misleading to a reasonable consumer visiting a quick-service restaurant, and no precedent suggests otherwise." MTD at 18. *Second*, BKC claims that the Plaintiffs' "consumer fraud claims do not satisfy [FED. R. CIV. P. 9(b)] or plead causation" because the SAC fails to "allege that any of the nineteen plaintiffs personally saw the photos they (wrongly) claim are misleading." *Id.* at 20–21. In advancing these arguments, BKC encourages us

to adopt the reasoning of the Eastern District of New York in *Chimienti v. Wendy's International, LLC*, 698 F. Supp. 3d 549 (E.D.N.Y. 2023) (Gonzalez, J.). *See id.* at 9 ("Plaintiffs in this case, and a plaintiff represented by the same lawyers in a companion suit filed in the Eastern District of New York against Burger King competitors McDonald's and Wendy's, alleged wide-ranging consumer fraud and breach of contract claims because, they assert, the burgers they ordered from these quick-service restaurants did not look like the meticulously crafted photos of those sandwiches in the restaurants' advertising. A U.S. District Court judge in the Eastern District of New York has just dismissed all claims against McDonald's and Wendy's with prejudice, finding those claims to be unreasonable and inadequately pleaded. BKC submits that Plaintiffs' claims here should fail for the same reasons." (cleaned up)).

The lawsuit in *Chimienti*, as here, was filed by a disgruntled plaintiff who believed that McDonald's and Wendy's were "publish[ing] advertisements with pictures of their menu items that look more appealing than how the menu items turn out when served to customers." 698 F. Supp. 3d at 554. The *Chimienti* Plaintiff alleged that the defendants "overstate[d] the amount of toppings" and "the thickness of the beef patties" in their advertisements and that, because of this deception, the plaintiff "expected the burgers that he purchased to be similar in size to the pictures of the burgers in Defendants' advertisements and on Defendants' store menu ordering boards. However, the size of the burgers that [the plaintiff] received were much smaller than advertised and [he was] financially damaged as a result." *Id.* at 554–55 (cleaned up). The court found these allegations insufficient to state a viable claim under Section 349 of New York's General Business Law, which "provides a cause of action for any person injured by the deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]" *Id.* at 556 (quoting *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020)). Because *Chimienti* addresses so many of the issues we're dealing with here, we'll spend some time dissecting its holding.

As an initial matter, the *Chimienti* Court found, as a matter of New York law, that the plaintiff could not state a claim because he "did not allege that [he] ever saw the advertisements that [he] claimed were misleading before purchasing the advertised products from defendants." *Id.* at 557. Plus, the court reasoned, even if he *had* seen those allegedly misleading advertisements, it was unlikely that those ads would have misled a reasonable consumer. *Id.* at 559. After all, "Plaintiff alleges neither that Defendants use more meat than stated in these advertisements to create the pictures of the products used in the ads nor that Plaintiff received less meat than described in the ads." *Ibid.*; *see also ibid.* ("As described above, Plaintiff does not allege that Defendants created a misleading impression about the size of their meals by using more meat in their advertisements than they serve in their stores—he instead alleges that Defendants create this impression by using an identical amount of uncooked meat in their ads. . . . This concession that both the advertisements and the products served in stores contain the same amount of meat is fatal to Plaintiff's claims.").[3] In the court's view, in short, the plaintiff hadn't plausibly alleged that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* at 560 (quoting *Lee v. Mondelez Int'l, Inc.*, 637 F. Supp. 3d 116, 132 (S.D.N.Y. 2022)). BKC now asks us to apply *Chimienti*'s holding to our facts.

The Plaintiffs counter along several fronts. Although they agree that, whichever state's consumer-protection laws apply, "the 'reasonable consumer' standard applies here to determine whether a representation is false or deceptive," they insist that we've already found that "most reasonable consumers would be vexed" by BKC's advertisements. Response at 9–10. The Plaintiffs also say that *Chimienti* is distinguishable from our facts because "the burger patties [there] were inflated

---

[3] The *Chimienti* Court didn't address Rule 9(b)'s "pleading-with-particularity requirement[ ]" because "an action under [N.Y. GEN. BUS. LAW § 349] does not require proof of the same essential elements (such as reliance) as common-law fraud[.]" 698 F. Supp. 3d at 556 (quoting *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005)).

in advertisements by as low as only 15%," whereas BKC's "advertisements inflated the beef patty by double the amount[.]" *Id.* at 10–11. The Plaintiffs separately reject BKC's position that Rule 9(b) applies "to Plaintiffs' claims for violations of state consumer statutes"—and, in the alternative, they say we "previously found that Plaintiffs have alleged sufficient facts to meet the Rule 9(b) standard[.]" *Id.* at 12. Finally, the Plaintiffs argue that they've adequately alleged causation because, "at the time of their purchase, they expected the burgers that they purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board." *Ibid.*[4]

To assert a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), the plaintiff must show "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Figueredo v. Tropicale Foods, LLC*, 2024 WL 1462404, at *2 (S.D. Fla. Apr. 4, 2024) (Altman, J.) (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016)). A consumer is "deceived" if "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, the consumer's detriment. This standard requires a showing of probable, not possible, deception, that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier*

---

[4] Both sides try to buttress their arguments with evidence they've uncovered during discovery. *See, e.g.*, MTD at 24 ("Further, even if any of the Plaintiffs had alleged visiting a Burger King and ordering a sandwich based on no information other than a photo of the item—which none of them did—the evidentiary record developed in discovery precludes Plaintiffs from alleging at this stage that any photo of a Burger King hamburger used a larger patty than Burger King restaurants serve to guests."); Response at 13 ("In addition, Plaintiffs have submitted evidence in support of their motion for class certification, which Defendant ignores, showing that the same challenged photograph of the Whopper was uniform at all major food delivery services and at various Burger King drive-through locations."). We won't be considering any of this extraneous evidence, which would convert BKC's motion to dismiss into a motion for summary judgment. *See Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) ("The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint."). Although the "incorporation-by-reference doctrine" allows us to consider evidence if it "is (1) central to the plaintiff's claims; and (2) undisputed," *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024), much of the parties' evidence is, in fact, quite disputed, *see generally* Objections to Plaintiff's Reply in Support of Class Certification [ECF No. 54]; Defendant's Motion for Sanctions [ECF No. 71]. We therefore adopt BKC's prudent suggestion that we "need not . . . consider any documents other than the SAC and the sources Plaintiffs rely upon in the SAC" to adjudicate the MTD. Reply at 14.

*Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (cleaned up); *see also Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1361 (S.D. Fla. 2018) (Martinez, J.) ("In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created. If the statements are likely to mislead reasonable consumers, then it makes no difference if the statements are technically or literally true.").

Both sides agree that we should apply Florida's articulation of the "reasonable consumer test" to all eleven consumer-protection counts because each of the eleven states at issue here uses a materially similar test. *See* MTD at 16–17 ("Courts of Appeals covering the other states where Plaintiffs reside also have explained the test in similar ways."); Response at 9 ("Defendant concedes that the 'reasonable consumer' standard applies here to determine whether a representation is false or deceptive under the laws of Arizona, California, Connecticut, Florida, Illinois, Kentucky, Massachusetts, Michigan, New Jersey, New York, and Pennsylvania, and that the standard is substantially similar in said states."). We agree that *all but one* of these states apply the reasonable-consumer test in (substantially) the same way as Florida does and will apply this standard to those ten counts. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("Appellants' claims under [the California Unfair Competition Law] are governed by the 'reasonable consumer' test. . . . Under the reasonable consumer standard, Appellants must show that members of the public are likely to be deceived." (cleaned up)); *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 100 (2d Cir. 2019) ("An act or practice is deceptive under [Connecticut law] if the defendant makes a material representation or omission likely to mislead consumers who interpret the message reasonably under the circumstances. The deception standard is objective in nature, and a representation is deceptive only if it is likely to mislead rather than merely has the tendency or capacity to do so." (cleaned up)); *Vanlaningham v. Campbell Soup Co.*, 492 F. Supp. 3d 803, 808 (S.D. Ill. 2020) ("The reasonable consumer test [in Illinois] requires a probability that a significant portion of the general consuming public, acting reasonably in

the circumstances, could be misled." (cleaned up)); *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019) ("An advertisement is deceptive [in Massachusetts] when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (*i.e.*, to entice a reasonable consumer to purchase the product)." (cleaned up)); *Dix v. Am. Bankers Life Assurance Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987) ("We hold that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations.");[5] *Deibler v. SanMedica Int'l, LLC*, 2021 WL 6198062, at *11 n.21 (D.N.J. Dec. 30, 2021) ("Under the New Jersey Consumer Fraud Act . . . , the issue of whether a particular statement on a product's packaging or labeling is false, deceptive, or materially misleading is evaluated according to an objective 'average consumer' standard."); *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020) ("Under [New York law], it is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer."); *M.T. v. Saum*, 7 F. Supp. 3d 701, 705 (W.D. Ky. 2014) ("[The Kentucky Consumer Protection Act] applies only where there is some evidence of unfair, false, misleading or deceptive acts . . . . The terms false, misleading and deceptive are given their ordinary meaning as understood by a reasonably prudent person of common intelligence." (cleaned up)); *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) ("To establish liability under [Pennsylvania law] a plaintiff must

---

[5] Michigan law is somewhat unique in that it modifies the "reasonable consumer" test if the defendant's alleged deception involves "an omission that would mislead or deceive a reasonable consumer." *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 398 (Mich. Ct. App. 1999). In that kind of scenario (call it the deceptive-omission case), "the issue [under Michigan law] is not whether the omission is misleading to a reasonable consumer but whether the consumer could reasonably be expected to discover the omission at issue." *Ibid.* Since this case doesn't involve "misleading or deceptive omissions," though, we needn't bother with Michigan's modified reasonable-consumer test.

present evidence showing . . . a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances.").

This leaves us with one state that doesn't fit neatly into the "reasonable consumer" paradigm: Arizona. *See* MTD at 17 n.3 (recognizing that "Arizona law may or may not be slightly different"). Arizona's consumer-protection law is unique in that it *doesn't* consider reasonableness at all and instead asks us to analyze the allegedly deceptive conduct "from the perspective of the 'least sophisticated reader[.]'" *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 829 (D. Ariz. 2016); *see also Correa v. Pecos Valley Dev. Corp.*, 617 P.2d 767, 771 (Ariz. Ct. App. 1980) ("Injury occurs when the consumer relies on the misrepresentation, even though reliance need not be reasonable."). The "least-sophisticated" reader or consumer "can be presumed to possess a rudimentary amount of information about the world"— and, in applying Arizona law, we don't engage in "bizarre or idiosyncratic interpretations" to preserve a patently frivolous claim. *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1194 (11th Cir. 2010). At the same time, Arizona law requires us to assume "that consumers of below-average sophistication or intelligence are especially vulnerable to fraudulent schemes" and prohibits us from assessing deceptiveness based on "assumptions about the 'average' or 'normal' consumer." *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993). That's why, under Arizona law, we focus on whether there was a "capacity to mislead" rather than on whether a reasonable consumer would be misled. *See Madsen v. W. Am. Mortg. Co.*, 694 P.2d 1228, 1232 (Ariz. Ct. App. 1985) ("[I]n evaluating the [defendant's] representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found." (cleaned up)).

Putting Arizona and the "least-sophisticated consumer" test aside for the moment, the main issue before us is relatively straightforward: Would a "reasonable consumer" be deceived by BKC's in-store advertisements? After careful review—and drawing all reasonable inferences for the Plaintiffs—we find it *plausible* to believe that some reasonable consumers could be deceived by BKC's

advertisements. *See Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 556 U.S. at 570)). The Plaintiffs' issue with the offending in-store (and online) advertisements is that BKC "advertises its burgers as large burgers compared to competitors and containing oversized meat patties and ingredients that overflow over the bun to make it appear that the burgers are approximately 35% larger in size, and contain more than double the meat, than the actual burger." SAC ¶ 3; *see also id.* ¶ 11 ("Burger King materially overstates the size of nearly every menu item in its current advertisements[.]"); Response at 10–11 ("Here, Plaintiffs plausibly allege in the [SAC] that the advertisements inflated the beef patty by double the amount, that is 100%."). We agree with the Plaintiffs that, at this very preliminary phase of the case, and drawing all reasonable inferences in the Plaintiffs' favor, BKC's advertisements—when compared to other, similar advertisements—have a greater capacity to deceive or mislead reasonable consumers.

It's true (of course) that the exaggeration of an item's quantity (and, for that matter, quality) with idealized imagery is an extremely common technique in the world of food advertising. To the extent BKC argues that reasonable consumers *usually* aren't fooled by these types of advertisements, we agree. *See, e.g.*, *Chimienti*, 698 F. Supp. 3d at 559 ("Several courts within the Second Circuit have dismissed . . . . claims in analogous circumstances where customers received the same objective amount of product that was advertised yet alleged that the defendants' advertisements made it appear that customers would receive a larger portion."); *Wurtzburger v. Ky. Fried Chicken*, 2017 WL 6416296, at *3 (S.D.N.Y. Dec. 13, 2017) ("The Complaint asserts that the food packaging (the bucket) was deceptive because Plaintiff believed she would receive more chicken. Such a contention, however, is inconsistent with Plaintiff's other allegations and lacks reason. Plaintiff affirmatively states she purchased an eight piece chicken meal. She does not claim she received less than eight pieces. To the contrary, the alleged deceptive act is that she expected KFC to deliver a bucket of chicken filled to the

rim, in excess of the number of pieces she purchased, because the bucket could accommodate more than the eight pieces. Such a practice—the use of a larger than necessary bucket—is not materially deceptive or misleading to a reasonable consumer acting reasonably under the circumstances, especially when the consumer ordered, purchased, and received the precise number of items requested." (cleaned up)); *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 193–94 (E.D.N.Y. 2018) ("Where consumers only care about the amount or quantity of food, the actual size of the candies is immaterial when the Product affirmatively discloses how much food the box contains. Consumers receive the same amount or quantity of food, as provided on the label, regardless of the density of the candy and whether the container is larger than necessary."); *see also Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018) (Thapar, J.) ("Think, for instance, of the reasonable consumer at the fast-food drive-through. Does he expect that the hamburger he receives at the window will look just like the one pictured on the menu? Of course not. He knows that puffery is a fact of life.").

But the Plaintiffs have alleged that BKC's advertisements go beyond mere exaggeration or puffery. BKC's advertisements (the Plaintiffs say) "make it appear that the burgers are approximately 35% larger in size, and contain more than double the meat, than the actual burger." SAC ¶ 3. Even more problematically, BKC's advertisements changed in 2017 to "materially overstate the size of its burgers" in comparison to previous years. Here's an illustration of this practice, as alleged in the SAC:

**FORMER ADVERTISEMENT**          **CURRENT ADVERTISEMENT**




13

SAC ¶ 8. The Plaintiffs, in short, aren't just arguing that BKC is exaggerating the *quantity* or *quality* of its products through common food-styling practices; they're also alleging that these advertisements are misleading customers into believing that the size of BKC's burgers has, in fact, increased since 2017—when it hasn't. *See id.* ¶ 9 ("Although the size of the Whopper and the beef patty increased materially in Burger King's advertisements, the amount of beef or ingredients contained in the actual Whopper that customers receive did not increase."); Response at 11 ("If Burger King's Whopper patties were all the same weight and its policy with food stylists was to use the same Whopper ingredients, there remains an issue of fact as to how the Whopper patty seemingly doubled in size in advertisements.").

These allegations thus distinguish our case from *Chimienti* in two meaningful ways. *First*, the Plaintiffs have pled that BKC's advertisements overstate the size of its products to a much greater degree than the *Chimienti* Defendants were accused of doing. *Compare* SAC ¶ 3 ("Burger King advertises its burgers as large burgers compared to competitors and containing oversized meat patties and ingredients that overflow over the bun to make it appear that the burgers are approximately 35% larger in size, and contain more than double the meat, than the actual burger."), *with* Complaint, *Chimienti v. Wendy's Int'l, LLC*, No. 22-cv-2880 (E.D.N.Y. May 17, 2022), ECF No. 1 ¶ 8 ("The beef patties that Wendy's uses for its advertisements are not fully cooked to make it appear that they are approximately 15–20% larger than the beef patties that are actually served to customers."), *and id.* ¶ 26 (same, but for McDonald's beef patties). As we explained in our prior order, reasonable consumers could be misled if the disparity between the size of a burger in an ad and size of the burger in the real world becomes too great. *See Coleman*, 2023 WL 5507730, at *8 ("We'll agree with Burger King (of course) that most reasonable people would be unfazed by, say, a one-percent disparity between the amount of food they were offered and the amount they ultimately received—just as (we would think) Burger King would concede that a fifty-percent delta between what was promised and what was sold

would probably vex most reasonable consumers. . . . Who are we to decide whether such a seemingly

substantial difference between what was promised and what was sold was (or was not) enough to alter

the purchasing preferences of reasonable American consumers?").[6]

 *Second*, and perhaps more importantly, the Plaintiffs plausibly allege that a reasonable consumer

could have been deceived into believing that BKC had increased the size of its burgers since 2017

because BKC's advertisements "show[ ] that the burger increased in size by approximately 35% and

the amount of beef increased by more than 100%" in comparison to BKC's pre-2017 advertisements.

SAC ¶ 8; *see also id.* ¶ 9 ("Although the size of the Whopper and the beef patty increased materially in

Burger King's advertisements, the amount of beef or ingredients contained in the actual Whopper that

customers receive did not increase."). A change like this (the Plaintiffs have plausibly suggested) could

lead reasonable consumers to believe (incorrectly, as it turns out) that BKC increased the size of its

burgers in 2017. *Cf. Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ("[I]n determining

---

[6] BKC appears to suggest that a reasonable consumer can *never* be deceived by an advertisement, so long as the advertisement accurately portrays the product's ingredients. *See* MTD at 18 ("The Burger King Whopper undisputedly contains all the ingredients one can see in the website photo pasted into the SAC: a quarter-pound beef patty, lettuce, tomato and onion slices, pickles, and two sauces. Plaintiffs' own example of a written description of the Whopper accurately describes the beef patty used in the Whopper as being '¼ pound' in its precooked weight. In no sense, therefore, did BKC promise guests more food than it delivered. Styling ingredients for photographic purposes, such as by pulling them forward so a head-on image clearly shows what the burger contains, is not misleading to a reasonable consumer visiting a quick-service restaurant, and no precedent suggests otherwise."). But the reasonable-consumer test is not so rigid. To determine whether an advertisement is "likely to mislead consumers acting reasonably," we consider "the net impression created" and disregard the advertisement's literal truth if it is still "likely to mislead reasonable consumers[.]" *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1299 (S.D. Fla. 2017) (Martinez, J.). The mere fact that BKC's advertisements dutifully inform a customer about a burger's ingredients is thus not enough to prevent confusion if the advertisements *also* convey something misleading about that burger. So, to use a very obvious example, an advertisement can still be misleading if it accurately markets a burger as containing two buns, a meat patty, lettuce, tomato, and onions *if* the burger patty itself turns out to be, say, 90% smaller than advertised. Taking the Plaintiffs' allegations as true (as we must at this stage of the litigation), we agree that a reasonable consumer could be misled by BKC's advertisements given that (allegedly) they "materially overstate[ ] the size of nearly every menu item"—even if those same advertisements accurately portray the product's ingredients. SAC ¶ 11.

whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."). BKC's only response (raised for the first time in Reply) is that "[t]he current and past photos are styled entirely differently, and taken from different angles," and that the Plaintiffs' allegations are "just hyperbole unsupported by any allegations of actual facts." Reply at 10. This argument completely ignores the strictures of Rule 12(b)(6). The Plaintiffs allege that BKC's advertisements changed in 2017, and they even provide a side-by-side comparison to substantiate this claim. *See* SAC ¶ 8. We must "accept[ ] the facts alleged in the [Plaintiff's SAC] as true" and "draw[ ] all reasonable inferences in [the Plaintiffs'] favor," even if BKC has a reasonable explanation for the change it implemented in 2017. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010); *see also Kominis v. Starbucks Corp.*, 692 F. Supp. 3d 236, 245 (S.D.N.Y. 2023) ("While it is well settled that in appropriate circumstances, a court may determine at the motion to dismiss stage that an allegedly deceptive misrepresentation would not have misled a reasonable consumer as a matter of law . . . such relief should rarely be granted[.] That is because the question of whether a representation is materially misleading is generally a question of fact not suited for resolution at the motion to dismiss stage." (cleaned up)).

Finally, we reiterate our view that the Plaintiffs' allegations are sufficient to satisfy Rule 9(b)'s heightened pleading standards.[7] Under Rule 9(b), a plaintiff bringing a claim sounding in fraud must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled

---

[7] For what it's worth, we also agree with the Plaintiffs that "Rule 9(b) does not to apply" to at least *some* of their "claims for violations of state consumer statutes." Response at 11; *see also, e.g., Chimienti*, 698 F. Supp. 3d at 556 ("[A]n action under [New York's consumer-protection statute] is not subject to the pleading-with-particularity requirements of Rule 9(b)."); *Warriors & Fam. Assistance Ctr. LLC v. Trajector Inc.*, 2024 WL 4627134, at *2 (N.D. Fla. Sept. 24, 2024) (Winsor, J.) ("There seems to be no binding precedent on whether Rule 9(b) necessarily applies to all Lanham Act false advertising claims or all FDUTPA claims."); *but see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("In fact, we have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of [California's consumer-protection statute]."). None of this matters much here, though, because we find that the Plaintiffs have satisfied Rule 9(b) in any event.

the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (cleaned up). As we explained in our order denying BKC's First Motion to Dismiss:

> Our Plaintiffs have met this standard here: In addition to the allegations we've highlighted above, they claim that they bought specific Burger King food items at Burger King stores in their resident states, and that they were duped by the promotional images of the burgers they saw online, on TV, and on Burger King's menu-ordering boards. They also allege that every class member 'purchased an Overstated Menu Item' sometime after September 1, 2017. And they identify what they believe to be the salient misrepresentations: images of the burgers and sandwiches displayed on Burger King's 'website and store menu ordering boards. Based on these allegations, we find that the Plaintiffs have adequately (if just barely) pled a cause of action for negligent misrepresentation because they've given us the *who* (Burger King), *what* (oversized images of the burgers), *when* (after September 1, 2017), *where* (online, on TV, and in stores), and *how* (advertising and in-store misrepresentations about the size of the menu items) of the misstatements.

*Coleman*, 2023 WL 5507730, at *9 (cleaned up). The Plaintiffs' allegations haven't materially changed since then, and we see no reason (nor has BKC articulated one) to reconsider our prior holding. *Cf. Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) ("[Reconsideration] is to correct manifest errors of law or fact or to [consider] newly discovered evidence.").[8]

*     *     *

For all these reasons, BKC's MTD is **DENIED** as to the Plaintiffs' consumer-protection claims (Counts 1–11).

## II.    The Florida Common-Law Claims (Counts 12–14)

The Plaintiffs also advance three common-law claims under Florida law: breach of contract (Count 12); negligent misrepresentation (Count 13); and unjust enrichment (Count 14). *See* SAC ¶¶

---

[8] BKC insists that the Plaintiffs failed to plead causation because "none of the Plaintiffs claim to have seen [BKC's advertisements] before ordering burgers from Burger King restaurants." MTD at 21. We'll address (and reject) this argument below. *See post*, at 19 & note 10.

225–44.[9] We rejected BKC's prior request that we dismiss these counts. *See generally Coleman*, 2023 WL 5507730, at *6–11. Undeterred by our prior ruling, BKC has again moved to dismiss these three counts—arguing that there has been a "change of circumstances" since our previous order that now justifies dismissal. MTD at 23. The Plaintiffs counter that BKC has "not provide[d] any new evidence to suggest that the Court should deviate from its prior ruling." Response at 19. After careful review, we reject BKC's arguments here as well.

### A.  Breach of Contract (Count 12)

We'll begin with the breach-of-contract claim. We previously found that BKC's "in-store 'menu order boards'" could "become an offer if a 'reasonable person' would have thought that 'the advertisement or solicitation was intended as an offer.'" *Coleman*, 2023 WL 5507730, at *7 (quoting *Schultz v. Am. Airlines, Inc.*, 2018 WL 7287194, at *3 (S.D. Fla. Sept. 25, 2018) (Reinhart, Mag. J.), *report and recommendation adopted*, 2018 WL 7287149 (S.D. Fla. Oct. 11, 2018) (Rosenberg, J.)). We also determined that a reasonable person "could have viewed [BKC's] in-store depictions of its menu items as offers," and that the Plaintiffs had plausibly alleged a contractual breach because they claimed "that they purchased Burger King products on the expectation that those items would resemble the images on Burger King's store ordering board. They also allege that they received items that were materially smaller than advertised, and that they wouldn't have purchased those items had they known their true size." *Id.* at *7–8.

BKC insists that the "present record" "no longer supports any premise that Plaintiffs, or anyone else, saw the cropped photo pasted into the SAC without any accompanying context, or that the photo 'promised' more beef than the guest would receive." MTD at 23; *see also* Reply at 12 ("Plaintiffs' inability to contend any longer that BKC used a larger patty in the challenged photos than

---

[9] Although the SAC doesn't specify which state's law these three counts are brought under, the Plaintiffs clarify in their Response that we should apply Florida law. *See* Response at 17–20.

Burger King restaurants serve to guests is independently fatal to their contract claim."). BKC also argues that the Plaintiffs haven't pled "the appearance of any actual in-store menu board they saw" or alleged that they purchased food from BKC *because* of that in-store menu board. MTD at 23. We disagree.

The Plaintiffs' breach-of-contract claim remains viable because they allege that the food they received didn't "*resemble* the images on Burger King's store ordering board." *Coleman*, 2023 WL 5507730, at *8 (emphasis added & cleaned up). "To prevail in a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017). A breach is not "material" unless "the failure to perform the contractual obligation [is] central to the contract . . . [because] trivial noncompliance and minor failings do not constitute material breaches." *Eclectic Synergy, LLC v. Seredin*, 347 So. 3d 27, 29 (Fla. 4th DCA 2022) (cleaned up). We previously found that "a sandwich's appearance [is] an essential term of a contract" and that there can be a breach when there's "a seemingly substantial difference between what was promised and what was sold"—such as when the buyer "receive[s] items that [are] materially smaller than advertised[.]" *Coleman*, 2023 WL 5507730, at *8. And our Plaintiffs continue to plausibly allege that the burgers they bought were materially smaller than the burgers they saw advertised on the menu boards. *See* SAC ¶ 229 ("Defendant failed to disclose that the Overstated Menu Items were smaller than advertised."); Response at 18 ("Here, Plaintiffs allege that Burger King made an offer through its advertisements and provided specification of the essential terms, which were actual photographs of what the products looked like, and Plaintiffs accepted and purchased the Menu Items based on the essential terms of the offers.").[10] We therefore find that the Plaintiffs have alleged a plausible breach-of-contract claim here.

---

[10] BKC's contention that the Plaintiffs failed "to specify an instore or other advertisement that [they] personally saw and that induced [their] purchase[s]," Reply at 6, finds no support in the SAC's

**B.  Negligent Misrepresentation (Count 13)**

We also find that the Plaintiffs have stated a viable negligent-misrepresentation claim. In our prior order, we held that BKC's "oversized images of the burgers"—which the Plaintiffs "saw online, on TV, and on Burger King's menu-ordering boards"—could constitute an actionable misrepresentation under Florida law. *Coleman*, 2023 WL 5507730, at *9. We explained that the Plaintiffs had "adequately (if just barely)" met Rule 9(b)'s heighted standard for fraud-based claims by giving us "the *who* (Burger King), *what* (oversized images of the burgers), *when* (after September 1, 2017), *where* (online, on TV, and in stores), and *how* (advertising and in-store misrepresentations about the size of the menu items) of the misstatements." *Ibid*. We also rejected BKC's position that the Plaintiffs had to show that a "special relationship exists between BKC and [the Plaintiffs] imposing an extraordinary duty of care on BKC," because Florida law does not require "a special relationship between the plaintiff and the defendant." *Ibid*. In rejecting this "special relationship" argument, however, we allowed BKC to "re-raise this issue in a subsequent motion to dismiss, *but only if* it finds Florida-law cases to support its position." *Id*. at *10 n.4. BKC has done just that—and now cites several Florida cases that (it believes) support its position. *See* MTD at 25 ("[The Court] should dismiss the negligent misrepresentation claim because Florida allows such claims only against defendants that are in the business of offering advice. An ordinary buyer-seller relationship is not sufficient.").

---

allegations. In fact, the Plaintiffs allege that the offending images appear "on [BKC's] website and store menu ordering boards" and that BKC has been using these same advertisements since "September 2017." SAC ¶¶ 4, 6. The Plaintiffs also claim that they observed these pictures (both online and in stores) and that they purchased food from BKC with the expectation that the food would resemble these advertisements. *See id.* ¶ 32 ("Mr. Coleman expected the burgers that he purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board. However, the size of the burgers that Mr. Coleman received were much smaller than advertised and he was financially damaged as a result. If Mr. Coleman knew that said burgers were much smaller than advertised, he would not have purchased the burgers."). These allegations are sufficient at this stage of the case.

BKC is right that, in many jurisdictions, "the defendant must be in a special relationship of trust or confidence with the plaintiff" and that, "absent a special relationship giving rise to a duty of care, a plaintiff cannot establish negligent misrepresentation." 37 C.J.S. FRAUD § 78 (2024); *see also Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 955 F.2d 1043, 1052 n.2 (6th Cir. 1992) ("Some courts impose liability upon a seller for negligent misrepresentation only if there existed a 'closer degree of trust and reliance than that of the ordinary buyer and seller.'" (quoting *Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 811 (N.Y. App. Div. 1976))). But *Florida* law doesn't seem to require plaintiffs to allege this kind of special relationship as a prerequisite for asserting a negligent-misrepresentation claim. As we previously explained, Florida "has expressly adopted the Restatement (Second) of Torts' position on negligent misrepresentation contained in section 552." *Coleman*, 2023 WL 5507730, at *9 (cleaned up) (citing *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997)).[11] And "the

---

[11] That section of the Restatement reads as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

>> a. by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>> b. through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

central principle operating within section 552 is that the defendant supplier of information must have *a pecuniary interest in the transaction or context in which the information is supplied* in order to merit the imposition of a duty of care in obtaining and communicating the information." *Blumstein v. Sports Immortals, Inc.*, 67 So. 3d 437, 441 (Fla. 4th DCA 2011) (emphasis added) (quoting *State by Bronster v. U.S. Steel Corp.*, 919 P.2d 294, 308 (Haw. 1996)); *see also Metrocity Holdings, LLC v. Bank of Am., N.A.*, 2023 WL 6064516, at *9 (S.D. Fla. Sept. 18, 2023) (Reinhart, Mag. J.) ("BOA does not address that under Section 552, a pecuniary interest may be a sufficient basis for imposing a duty of care in supplying information."). The *Blumstein* Court specifically distinguished Florida from states (like New York) that explicitly require a "special relationship"—pointing out that these other jurisdictions "*narrowed* the tort of negligent misrepresentation by requiring the existence of a 'special relationship'" instead of focusing on whether there was a pecuniary interest between the parties. 67 So. 3d at 441 & n.2 (emphasis added).

Resisting this common-sense reading of Florida law, BKC maintains that, "[a]lthough Florida courts do not use the term 'special relationship,'" Florida-law cases suggest that a defendant cannot be liable for negligent misrepresentation unless there are "bonds of trust with the plaintiffs[,] and [the defendants] were in the business of advising parties in the plaintiffs' positions." MTD at 25. In support of this point, BKC says that the balance of Florida case law allowing negligent-misrepresentation claims to proceed "involved the plaintiffs' reliance on advice provided by defendants that were in the business of offering that advice professionally." *Id.* at 26.

But none of BKC's cases held (or even implied) that Florida law requires a plaintiff asserting a negligent-misrepresentation claim to identify a special relationship. *See Wallerstein v. Hosp. Corp. of Am.*, 573 So. 2d 9, 10 (Fla. 4th DCA 1990) (finding negligent misrepresentation where "the appellee

---

RESTATEMENT (SECOND) OF TORTS § 552 (1977).

doctors assured [the plaintiffs] that the child was healthy and suitable for adoption"); *Butler v. Yusem*, 44 So. 3d 102, 106 (Fla. 2010) (holding that "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation"); *Dziegielewski v. Scalero*, 352 So. 3d 931, 934 (Fla. 5th DCA 2022) (holding that a buyer of a condominium could sue the seller's real-estate agent for negligent misrepresentation where, "[d]uring the closing, Buyer was again advised that her purchase included the exclusive right to use all three garage spaces. However, the day after the closing, Association notified Buyer that she only had the exclusive right to use one garage space."); *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 653 (Fla. 3d DCA 2006) (citing *Warren v. Dairyland Insurance Co.*, 662 So. 2d 1387 (Fla. 4th DCA 1995), for the proposition that an "insurer can be held liable for the negligent misrepresentations made by insurance agent of insurer"); *Fojtasek v. NCL (Bahamas) Ltd.*, 613 F. Supp. 2d 1351, 1355 (S.D. Fla. 2009) (Ungaro, J.) ("Plaintiff's claims [are] based in part on Defendant's own negligence in selecting the shore excursion operator (Tabyana Tours) [and] in failing to warn Plaintiff of the dangers involved in the shore excursion[.]"); *Thompson v. Procter & Gamble Co.*, 2018 WL 5113052, at *3 (S.D. Fla. Oct. 19, 2018) (Gayles, J.) ("In a products liability case where only economic damages are alleged, the economic loss rule bars a claim for negligent misrepresentation."). In fact, BKC hasn't found a single case—nor have we—holding that an "ordinary buyer-seller relationship is not sufficient" to state a valid claim for negligent misrepresentation under Florida law. MTD at 25.

Based on this body of Florida case law, we reiterate our view that the Plaintiffs *can* assert a negligent-misrepresentation claim under Florida law because they've alleged that BKC "had a pecuniary interest in its transactions with the Plaintiffs[.]" *Coleman*, 2023 WL 5507730, at *10; *cf. FLA Orthopedics, Inc. v. Am. Ins. Co.*, 896 So. 2d 1, 4 (Fla. 3d DCA 2004) ("[W]e conclude that FLA cannot establish its claim, as a matter of law, under the test set forth in the Restatement. . . . TAIC had no pecuniary interest in its insured's transactions with FLA. Any information received by TAIC from or about WAG was utilized solely to allow TAIC to underwrite the risk.").

### C.  Unjust Enrichment (Count 14)

Finally, BKC argues that the Plaintiffs cannot assert an unjust-enrichment claim. *See* MTD at 27 ("Accordingly, if the Court finds that Plaintiffs' deception claims as currently pleaded are not those of reasonable consumers, it also must find that BKC provided adequate consideration for the money they paid and dismiss their unjust enrichment claim."). To state an unjust-enrichment claim under Florida law, the Plaintiffs must show that they "conferred a benefit on [BKC], that [BKC] appreciated the benefit, and that [BKC's] acceptance and retention of the benefit under the circumstances made it 'inequitable for [BKC] to retain it without paying the value thereof.'" *Taxinet Corp. v. Leon*, 114 F.4th 1212, 1219 (11th Cir. 2024) (quoting *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022)). BKC says that the Plaintiffs received the benefit of their bargain—*viz.*, that "BKC provided adequate consideration for the money they paid"—so their unjust-enrichment claim fails as a matter of law. MTD at 27; *see also, e.g.*, *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1236 (S.D. Fla. 2007) (Jordan, J.) ("Both men purchased a cholesterol reducing drug, and both men obtained cholesterol reduction as a result. Therefore, in a general sense, they obtained the benefit of their bargain. Unjust enrichment 'cannot exist where payment has been made for the benefit conferred.'" (quoting *N.G.L. Travel Assocs. v. Celebrity Cruises, Inc.*, 764 So. 2d 672, 675 (Fla. 2000))). Trying to parry, the Plaintiffs say only that BKC "does not provide any new evidence to suggest that the Court should deviate from its prior ruling." Response at 20.[12]

---

[12] This is a rather unpersuasive response since we didn't grapple with the merits of this unjust-enrichment claim in our prior order. We instead held that the Plaintiffs were entitled to plead unjust enrichment—in addition to their breach-of-contract claim—as an alternative basis for relief. *See* *Coleman*, 2023 WL 5507730, at *11 ("There is, in sum, nothing wrong with a plaintiff who asserts a contract claim in count 1 and, in the alternative that no such contract is found to have existed, an unjust-enrichment claim in count 2."). But we *never* held that the Plaintiffs had stated a viable unjust-enrichment claim under Florida law, *see ibid.*, because BKC didn't advance this argument in its original motion to dismiss, *see* First Motion to Dismiss at 19–20.

This is another close call, but we think the Plaintiffs have barely stated a claim here. Although the Plaintiffs concede that they received some consideration for what they paid BKC, *see* SAC ¶ 32 ("Mr. Coleman purchased a Whopper and a Big King at a Burger King store located in the state of Florida."), there's still an open question as to whether this consideration was "adequate" in light of BKC's allegedly misleading advertisements, *see ibid.* ("Mr. Coleman expected the burgers that he purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board. However, the size of the burgers that Mr. Coleman received were much smaller than advertised and he was financially damaged as a result."). On the one hand, the "mere fact that an overpayment of some sort has been demanded" isn't enough to establish unjust enrichment;[13] on the other, consideration that has been received "due to fraud, misrepresentation, imposition, duress, undue influence, [or] mistake" is actionable. *Hall v. Humana Hosp. Daytona Beach*, 686 So. 2d 653, 656 (Fla. 5th DCA 1996); *see also, e.g., Rana Fin., LLC v. City Nat'l Bank of N.J.*, 347 F. Supp. 3d 1147, 1154 (S.D. Fla. 2018) (Cohn, J.) ("And if Plaintiff can demonstrate that Defendants procured the Subscription Agreement through fraud, it could potentially demonstrate that it would be inequitable for Defendants to retain the benefit."). The Plaintiffs allege that they only purchased BKC's products because of BKC's "wrongful acts and omissions" (*i.e.*, its "deceptive" advertisements), SAC ¶¶ 242–43, so they've alleged that they didn't receive adequate consideration. Plus, "[w]hether the consideration received was in fact adequate is not an appropriate question for [us]

---

[13] *See also In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 649 F. Supp. 3d 1245, 1255 (S.D. Fla. 2022) (Singhal, J.) ("Given the totality of the circumstances, Plaintiffs have not established that payment of full tuition for the Spring 2020 semester violates good conscience and fundamental principles of justice or equity. Plaintiffs were, first and foremost, students pursuing a degree which required them to earn a certain number of credit hours. They paid tuition for the privilege of taking classes at UM. By attending classes online after March 25, 2020, Plaintiffs were able to complete their courses and earn the necessary credits toward graduation. UM provided Plaintiffs what they paid for: the right to earn college credits at the University."), *aff'd sub nom. Dixon v. Univ. of Miami*, 75 F.4th 1204 (11th Cir. 2023).

to resolve at [the motion-to-dismiss] stage." *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4368980, at

*11 (S.D. Fla. Sept. 19, 2011) (Altonaga, J.). We'll thus allow the unjust-enrichment claim to proceed.

CONCLUSION

Accordingly, after careful review, we hereby **ORDER and ADJUDGE** as follows:

1. BKC's Motion to Dismiss [ECF No. 70] is **DENIED**.

2. In a separate order, we'll set a status conference to discuss a new schedule.

3. The Clerk is **DIRECTED** to **REOPEN** this case and **LIFT** the stay.

**DONE AND ORDERED** in the Southern District of Florida on May 5, 2025.

_

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record