**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-cv-20925-ALTMAN/Reid**

**WALTER COLEMAN**, *et al.*,

     *Plaintiffs*,

*v.*

**BURGER KING CORPORATION**,

     *Defendant.*

_____/

<u>**ORDER ON CLASS CERTIFICATION**</u>

Our Plaintiffs have brought this putative class action "against Defendant, Burger King Corporation ('BKC'), on behalf of themselves and all other similarly situated individuals who purchased a Burger King menu item based on false and misleading advertising concerning the size and/or the amount of ingredients contained in said menu item." Second Amended Complaint ("SAC") [ECF No. 69] ¶ 1. Having allowed the Plaintiffs' allegations to survive two motions to dismiss ("MTDs"), *see Coleman v. Burger King Corp.*, 2023 WL 5507730 (S.D. Fla. Aug. 25, 2023) (Altman, J.) ("*Coleman I*") [ECF No. 61]; *Coleman v. Burger King Corp.*, 2025 WL 1294605 (S.D. Fla. May 5, 2025) (Altman, J.) ("*Coleman II*") [ECF No. 83], we turn now to the Plaintiffs' Motion for Class Certification (the "Motion") [ECF No. 44]. BKC argues that class certification would be improper because the Plaintiffs' claims don't turn on common questions of law and fact, aren't typical of the absent class members' claims, and don't satisfy the strictures of Rule 23(b)(3). *See generally* Memorandum in Opposition to Class Certification (the "Response") [ECF No. 48]. After careful review, we **DENY** the Plaintiffs' Motion.

## BACKGROUND

Relying on the Plaintiffs' allegations that BKC materially overstates the size of its burgers in its advertisements, the Motion asks us to certify three nationwide classes: (1) a Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") class; (2) a breach-of-contract class under Florida common law; and (3) an unjust-enrichment class under Florida common law. [1] *See* Motion at 8–9; *see also* SAC ¶ 33 ("Burger King advertises its burgers as large burgers compared to competitors and containing oversized meat patties and ingredients that overflow over the bun to make it appear that the burgers are approximately 35% larger in size, and contain more than double the meat, than the actual burger."). Our Plaintiffs claim that "Burger King began to materially overstate the size of its burgers in its advertisements in September 2017," before which, they say, BKC advertised the Whopper "more fairly." *Id.* ¶ 8. The Plaintiffs each allege that they purchased a burger *because of* BKC's advertising, and they insist that they wouldn't have bought those burgers if BKC had accurately portrayed the size of its burgers. *See, e.g., id.* ¶ 32 ("Mr. Coleman purchased a Whopper and a Big King at a Burger King store located in the state of Florida. Mr. Coleman expected the burgers that he purchased to be similar in size to the pictures of the burgers in Burger King's advertisements and on Burger King's store menu ordering board. However, the size of the burgers that Mr. Coleman received were much smaller than

---

[1] The Plaintiffs didn't ask us to certify a Florida-only class for their claims of negligent misrepresentation, despite alleging a negligent-misrepresentation violation in their First and Second Amended Complaints. *See generally* Motion. BKC argues that this omission means we shouldn't certify a negligent-misrepresentation class. *See* Response at 24 n.9 ("Plaintiffs' [First Amended Complaint] pleads a claim for negligent misrepresentation. Plaintiffs' motion for class certification did not address this claim. Accordingly, Plaintiffs apparently concede that the claim is not appropriate for class treatment."). The Plaintiffs didn't respond to this argument. *See generally* Reply in Support of Class Certification (the "Reply") [ECF No. 51]. The Plaintiffs have thus forfeited any argument they could have advanced in support of a negligent-misrepresentation class, so we won't consider the potential certification of that class here. *See, e.g., Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 692 n.2 (S.D. Fla. 2016) (Dimitrouleas, J.) ("As Plaintiffs purportedly only seek to certify a damages class, Defendant argues that Plaintiffs have waived their right to certify a declaratory or injunctive relief class. Plaintiffs have not responded to this argument. The Court agrees with Defendant, and will analyze the class certification motion as to only the FDUTPA and Unjust Enrichment claims.").

advertised and he was financially damaged as a result. If Mr. Coleman knew that said burgers were much smaller than advertised, he would not have purchased the burgers."). If we don't certify their proposed nationwide classes, the Plaintiffs ask us to certify "state classes under the laws for . . . Florida, New York, Illinois, New Jersey, California, Connecticut, Massachusetts, Michigan, Kentucky, Mississippi, Ohio, Pennsylvania, or Arizona." Motion at 9.

After the Plaintiffs moved for class certification, BKC filed two MTDs, both of which have adjudicated. In adjudicating BKC's First MTD [ECF No. 20], we agreed with BKC that Count I of the Plaintiffs' First Amended Complaint ("FAC") [ECF No. 18] violated federal pleading standards because the Plaintiffs tried to cram "fifty different state (and DC) consumer-protection statutes" into one cause of action—so we dismissed Count I with leave to amend. *Coleman I*, at *2. On September 14, 2023, the Plaintiffs filed the SAC, which separated the FAC's Count I into eleven separate state consumer-protection claims. *See* SAC ¶¶ 70–224. BKC responded with its second MTD, which we denied, reasoning that the Plaintiffs had sufficiently alleged that their experiences, as recounted in the SAC, gave rise to potentially viable claims against BKC. *See generally Coleman II.*

On June 2, 2025, we held a status conference with the parties during which we noted that, given our adjudication of the MTDs, "a lot has changed" since the Plaintiffs filed their class-certification motion. Status Hearing Transcript [ECF No. 92] at 4. We therefore asked the Plaintiffs whether, considering these changes, they wanted to re-brief their class-certification request. *See ibid.* The Plaintiffs declined and insisted that "the class cert. motion is okay to rule on if we can." *Ibid.* We'll therefore adjudicate the Motion as it stands today.[2]

## THE LAW

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. *See* FED. R. CIV.

---

[2] During that same status hearing, the Plaintiffs also agreed to limit their proposed classes to purchasers of the Whopper and the Big King *only*. *See* Status Hearing Transcript at 5.

P. 23. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For a district court to certify a class, the proposed class "must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a)" and "at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004) (cleaned up). Plus, "a district court must decide that a class is ascertainable before it may turn to the requirements of Rule 23(a)." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021).

Rule 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 564 U.S. at 349. Under Rule 23(a), a district court may certify a class only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a)(1)–(4). These four requirements—commonly referred to as "numerosity, commonality, typicality, and adequacy of representation"—are "designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003). A class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Before the court can certify a proposed class, the plaintiffs must also establish that the class satisfies at least one of Rule 23(b)'s three requirements. *See Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). Rule 23(b) sets forth three types of class actions. *See* FED. R. CIV. P. 23(b)(1)–(3). Our Plaintiffs seek class certification under Rule 23(b)(3), *see* Motion at 13, which allows a district court to certify a class only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy," FED. R. CIV. P. 23(b)(3). "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co.*, 350 F.3d at 1188 n.15 (citing *Falcon*, 457 U.S. at 160). And so, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

"All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation. A district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016) (cleaned up).

## ANALYSIS

The Plaintiffs' three claims are all based on one overarching contention—that BKC customers were deceived into purchasing BKC menu items "based on false and misleading advertising concerning the size and/or the amount of ingredients contained in said menu item[s]." SAC ¶ 1. At the MTD stage, the Plaintiffs benefited from our deferential standard of review. *See Coleman II*, at *7 ("We must accept the facts alleged in the Plaintiffs' SAC as true and draw all reasonable inferences in the Plaintiffs' favor[.]" (cleaned up)); *see also id.* at *9 ("We explained that the Plaintiffs had 'adequately (if just barely)' met Rule 9(b)'s heighted standard for fraud-based claims[.]" (quoting *Coleman I*, at *9)); *id.* at *11 ("This is another close call, but we think the Plaintiffs have barely stated a claim here."). On a motion for class certification, though, the Plaintiffs are no longer entitled to a "mere pleading standard" and must "affirmatively demonstrate" their compliance with each element of Rule 23. *Dukes*, 564 U.S at 350.

BKC contends that the Plaintiffs have failed to satisfy *both* Rule 23(a)'s commonality and typicality requirements *and* Rule 23(b)(3)'s predominance and superiority requirements. *See generally* Response. We agree that the Plaintiffs haven't carried their Rule 23 burden. Because the Plaintiffs have plainly failed to show that common issues predominate in this case, we'll start our analysis there.

## I.     Rule 23(b)(3)

Under Rule 23(b)(3), a party may proceed with a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

"Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay*, 382 F.3d at 1255 (cleaned up). A proposed class isn't suitable for certification if, "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Ibid.* Under Rule 23(b)(3), plaintiffs also bear the burden of "establishing that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

In assessing the Rule 23(b)(3) superiority requirement, a district court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)–(D). The predominance analysis "has a tremendous impact on the superiority analysis" because "the more common issues predominate over individual issues, the more

desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiff's claims." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010) (cleaned up).

### a. Individual Questions of Law Predominate

When plaintiffs seek certification of a nationwide or multi-state class, they bear the burden of demonstrating that "variations in state law" don't threaten to "swamp any common issues and defeat predominance." *Klay*, 382 F.3d at 1261; *see also Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987) (upholding district court denial of certification where "differing standards of liability required by the laws of the various states would render class action treatment unmanageable"); *see also Sacred Heart*, 601 F.3d at 1180 ("Undeniably, it falls to the plaintiff to demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable."). "In cases implicating the law of all fifty states," such as nationwide class actions, "the party seeking certification must provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Sacred Heart*, 601 F.3d at 1180. It's our duty to determine "whether the plaintiffs have borne their burden where a class will involve multiple jurisdictions and variations in state law." *Ibid.* (cleaned up); *see also Townhouse Rest. of Oviedo, Inc. v. NuCO2, LLC*, 2020 WL 5440581, at *6 (S.D. Fla. Sept. 9, 2020) (Rosenberg, J.) ("Plaintiffs' failure to show the absence of conflicts among other states' laws is fatal to certifying a nationwide class."). "[W]here the laws of fewer than all fifty states are at issue, it is clear that more than a perfunctory analysis is required." *Sacred Heart*, 601 F.3d at 1180. The Plaintiffs have failed to meet this burden for any of their proposed classes.

### i. The FDUTPA Class

The Plaintiffs seek certification of a nationwide FDUTPA class. *See* Motion at 9–10. They argue that the application of FDUTPA to a nationwide class is appropriate because "Burger King's significant contacts to the state of Florida make application of Florida law constitutional, and Florida's 'most significant relationship' test warrants the application of Florida law." Motion at 14. We disagree.

Courts in our Circuit have routinely held that we apply the consumer-protection laws of the state in which the sale of the product occurred. *See Karhu v. Vital Pharms., Inc.*, 2014 WL 815253, at *10 (S.D. Fla. Mar. 3, 2014) (Cohn, J.), *aff'd*, 621 F. App'x 945 (11th Cir. 2015) ("[T]he Court concludes that the state with the most significant relationship to each class member's claim is the state where the individual purchased [the item]. This conclusion is buttressed by the interest each state has in enforcing its unfair trade practices laws for the well-being of its own consumers." (citations omitted)); *see also Rebman v. Follett Higher Educ. Grp., Inc.*, 248 F.R.D. 624, 632 (M.D. Fla. 2008) (Antoon II, J.) ("[T]he laws governing unfair and deceptive trade practices at the site of the sale would control. Because the laws of different states regarding unfair trade practices would control depending on the state in which the purchase at issue was made, [Plaintiffs] have not met their burden of establishing that common questions of law would predominate as to a FDUTPA nationwide class."). To each Plaintiff's consumer-protection claim, in other words, we must apply the consumer-protection law of the state in which *that* Plaintiff purchased either a Whopper or a Big King.

And, as we've said, because the Plaintiffs are seeking to certify a nationwide class, they bear the burden of "provid[ing] an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Sacred Heart*, 601 F.3d at 1180. But the Plaintiffs' Motion doesn't provide us with *any* analysis of potential state-law conflicts. They've thus utterly failed to meet their burden of showing that common issues of law predominate in their proposed nationwide FDUTPA class.

In the alternative, the Plaintiffs ask us to certify classes "under Florida, New York, Illinois, New Jersey, California, Connecticut, Massachusetts, Michigan, Kentucky, Mississippi, Ohio, Pennsylvania, and Arizona law." Motion at 16. Again, however, the Plaintiffs fail to show that, even as to these states, common questions of law predominate. The burden on the Plaintiffs, "where the laws of fewer than all fifty states are at issue," is to provide "more than a perfunctory analysis." *Sacred Heart*, 601 F.3d at 1180. The Plaintiffs haven't met that burden. Their "analysis" on this issue, in fact,

is just one sentence long. "A trial on these common laws," they assert in the most conclusory way, "will be easily managed and a jury can easily be instructed on the variances in any law." Motion at 16 (citation omitted). That's it. No side-by-side comparison of what these variances might be, no citations to any of the relevant statutes or the cases interpreting them, no discussion of the various laws' elements, no explanation of how difficult it might be to instruct the jury on the "variance in any law." This isn't even a *perfunctory* analysis—it's no analysis at all. The Plaintiffs have therefore fallen well short of their burden to certify their proposed consumer-protection classes.[3]

### ii.   The Breach-of-Contract Class

The Plaintiffs also ask us to certify a nationwide breach-of-contract class under Florida common law on the theory that the "Defendant breached its sales contracts with Plaintiffs and similarly situated customers who purchased an Overstated Menu Item." SAC ¶ 228. We should apply Florida common law, the Plaintiffs say, to the millions of people who have purchased BKC products in all fifty states because (in their view) Burger King's significant Florida contacts justify the nationwide application of Florida law. *See* Motion at 14. But, as BKC observes, the Plaintiffs misstate Florida law. Under Florida law, breach-of-contract claims are governed by the law of the state in which the contract was made. *See Slam Dunk I, LLC v. Conn. Gen. Life Ins. Co.*, 853 F. App'x 451, 453 (11th Cir. 2021) ("Florida follows the rule of *lex loci contractus* in determining which law applies to a breach-of-contract claim. Under this theory, in the absence of a contractual provision specifying the governing law, a contract . . . is governed by the law of the state in which the contract is made." (cleaned up)); *see also Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995) ("When resolving conflict-of-

---

[3] In *Coleman II*, we found that ten of the eleven states identified in Counts 1–11 of the SAC applied the reasonable-consumer test to their consumer-protection laws. *See Coleman II*, at *4. But the Plaintiffs declined the opportunity to amend their Motion to explain whether this commonality was sufficient to establish that common questions of law predominate. *See* Status Hearing Transcript at 4. At any rate, as we'll discuss below, the Plaintiffs' Motion suffers from other infirmities that prevent us from certifying their requested classes.

laws issues in contract actions, the Florida Supreme Court has unambiguously indicated its intent to reject the more modern (and flexible) significant contacts analysis of the second Restatement of the law of conflicts . . . choosing instead to adhere to the traditional rule of *lex loci contractus*." (cleaned up)). And there's no dispute that, "[i]n the case of a consumer product, the place of contracting is generally where the consumer purchased the product"—here, the state where each putative plaintiff purchased his or burger. *Karhu*, 2014 WL 815253, at *7 (citing *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1316 (S.D. Fla. 2009) (Gold, J.)). For the Plaintiffs' nationwide breach-of-contract class, therefore, the Plaintiffs bear the burden of "provid[ing] an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Sacred Heart*, 601 F.3d at 1180.

Again, however, they've failed to meet that burden. The Plaintiffs don't even pretend to analyze the various states' contract laws. *See* Motion 17–18. This lack of analysis is particularly troubling here because this isn't a case in which, for instance, the proposed class members all signed *the same* form contract—the kind of case where, as we once observed, a "breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey." *Verbal v. Tiva Healthcare, Inc.*, 2021 WL 9527858, at *7 (S.D. Fla. Aug. 19, 2021) (Altman, J.). In our case, to decide whether an individual Plaintiff entered into a contract with BKC based on the *specific* menu-board images, we would need to analyze each state's breach-of-contract laws. In *Coleman I*, we found "that a reasonable person *could have* viewed Burger King's in-store depictions of its menu items as offers" under Florida law (thus allowing the Plaintiffs to survive two MTDs). *Coleman I*, at *7; *see also Coleman II*, at *8 ("The Plaintiffs' breach-of-contract claim remains viable because they allege that the food they received didn't resemble the images on Burger King's store ordering board." (cleaned up)). But we made no such determination as to any *other* state's laws—and the Plaintiffs have wholly failed to address this issue.

Alternatively, the Plaintiffs ask us to certify breach-of-contract sub-classes under the laws of thirteen states. *See* Motion at 9. But, as with their proposed FDUTPA sub-classes, the Plaintiffs haven't performed even a perfunctory analysis of these states' contract laws. Because the Plaintiffs haven't come close to meeting their burden of showing that we could easily manage the variations in the relevant states' contract laws, we deny their request to certify their proposed state sub-classes.

### iii.   The Unjust-Enrichment Class

Finally, the Plaintiffs seek certification of a nationwide unjust-enrichment class because (in their view) "[i]t would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation they obtained from the deceptive, misleading, unfair and unlawful conduct alleged herein." SAC ¶ 243. If we decline to certify a nationwide unjust-enrichment class, the Plaintiffs request that we certify several state sub-classes. *See* Motion at 9. In support of their request for class certification, the Plaintiffs claim that "Burger King deceived consumers nationwide through uniform advertisements. Certification of a nationwide unjust enrichment class is entirely consistent with the practice in this District, and is warranted when Burger King has unjustly profited from its decision to falsely advertise the size of its burgers to consumers throughout the country." Motion at 18–19.

Again, however, the Plaintiffs have failed to "demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable." *Sacred Heart*, 601 F.3d at 1180. All they say this time is that "nationwide unjust enrichment classes are easily suitable for certification because there is general agreement among courts that the minor variations in the elements of unjust enrichment under the laws of the various states are not material and do not create an actual conflict." Motion at 17 (citing *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 675 (S.D. Fla. 2015) (King, J.)). But BKC counters that there are "sharp variations in the unjust enrichment laws of the states in which the Plaintiffs reside," citing cases from our Circuit in which courts have *refused* to certify unjust-enrichment classes because of differences in the various states' application of that cause of action.

Response at 24 (first citing *Petersen v. Am. Gen. Life Ins. Co.*, 2017 WL 11576347, at *3 (M.D. Fla. July 21, 2017) (Davis, J.); and then citing *Carrera v. UPS Supply Chain Sols., Inc.*, 2012 WL 12860910, at *7 (S.D. Fla. Sept. 21, 2012) (Lenard, J.)). In *Carrera*, the court found that the "[p]laintiffs have failed to meet their burden of showing sufficient uniformity in state [unjust-enrichment] law so as to satisfy Rule 23(b)(3)'s predominance and superiority requirements"—even though the plaintiffs there had "filed appendices surveying the law of unjust enrichment in forty-nine states plus the District of Columbia." 2012 WL 12860910, at *5.

Our Plaintiffs have done far less than that. Again, they haven't cited a single state's unjust-enrichment cases, outlined the elements of any state's unjust-enrichment cause of action, compared (or contrasted) the differences between the various states' unjust-enrichment laws, or explained how we might overcome any such differences in our jury instructions. Because they've thus failed to carry their burden of demonstrating that common questions of law predominate, we won't certify their proposed unjust-enrichment classes.

***

The Plaintiffs have failed to show that common questions of law predominate in any of their nationwide classes, and they haven't met their burden of demonstrating that common questions of law would predominate if we allowed them to certify thirteen state sub-classes.[4] Because the Motion asks us to certify the proposed classes under Florida law, we could (at our discretion) excise the other states from the proposed class definitions and proceed with Florida-only classes *if* we believed that these classes would satisfy the other strictures of Rule 23. But, as we'll discuss below, the Plaintiffs have failed to show that common questions of fact predominate, that damages are calculable on a

---

[4] In Reply, the Plaintiffs argue that "[t]his class action only arguably implicates differing state laws as to Defendant's affirmative defenses." Reply at 11. But the Plaintiffs bear the burden of showing that "variations in state law" don't threaten to "swamp any common issues and defeat predominance." *Klay*, 382 F.3d at 1261. They haven't done that and haven't given us any reason to believe that the variations between these laws is limited only to BKC's affirmative defenses.

class-wide basis, that they've met Rule 23(b)(3)'s superiority requirement, or that they've satisfied Rule 23(a)'s commonality requirement.[5]

### b. Individual Questions of Fact Predominate

To establish that common questions of fact predominate, a plaintiff must show that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, [ ] predominate over those issues that are subject only to individualized proof." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). Common issues do not predominate if, "as a practical matter, the resolution of an overarching issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009) (citation omitted).

The Plaintiffs tell us that that the predominant common questions are "[w]hether BKC's advertisements are misleading, and whether this was material to average consumers," and they insist that these common questions are "subject to common proof." Motion at 18. But BKC believes that common issues of fact *don't* predominate—and it feels this way for several reasons. *First*, it says, the Plaintiffs lack common evidence. *See* Response at 15 ("They do not identify any photo or group of photos that the 19 Plaintiffs all saw [ ], nor do they present a shred of proof that any photo (much less every photo) used a different beef patty than guests receive in Burger King restaurants—which no photo did—or offer any surveys or other evidence demonstrating how they would go about proving that any customer, all customers, or the average customer, has been misled."). *Second*, it argues that the Plaintiffs can't prove causation for their FDUTPA claim. *See id.* at 17 ("FDUTPA's causation and damages requirements mean all putative class members must prove individually that they bought hamburgers from Burger King because they saw a photo of the burger before they ordered it[.]").

---

[5] The Plaintiffs' failure to meet several *other* elements of Rule 23 (as documented below) is sufficient to dismiss *all* the Plaintiffs' proposed classes—even if they had shown that common issues of law predominate.

*Third*, it contends that many proposed class members are subject to an arbitration clause and a class-action waiver. *See id.* at 13–14. *Fourth*, it insists, the Plaintiffs cannot prove that every class member relied on any advertisement in a way that would create a valid contract *or* to a degree that would render BKC's retention of a benefit unjust. *See id.* at 20 ("[P]roving which photo any particular plaintiff relied upon to a degree sufficient to create a contract—or whether the circumstances of a class member's purchase would make BKC's retention of a benefit from that class member 'unjust'—would require individual inquiry."). *Fifth*, it argues that the Plaintiffs have failed to meet their evidentiary burden of providing a class-wide damages methodology. *See id.* at 20 n.7. Because these issues affect each substantive claim differently, we'll analyze the Plaintiffs' proposed Florida classes separately.

### i. The FDUTPA Class

To assert a claim under FDUTPA, a plaintiff must show "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Figueredo v. Tropicale Foods, LLC*, 2024 WL 1462404, at *2 (S.D. Fla. Apr. 4, 2024) (Altman, J.) (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016)).

### 1. The Plaintiffs Lack Common Evidence

The Plaintiffs base their FDUTPA claim on their allegation that class members were served a smaller burger than BKC had advertised. *See* Motion at 9 ("Specifically, Plaintiffs allege that Burger King materially overstates the size and/or amount of the beef patties and toppings in nearly every menu item in its current advertisements and store menu ordering boards."). In saying so, they argue that "[w]hether BKC's advertisements are misleading, and whether this was material to average consumers, are common questions subject to common proof." Motion at 18. But "any competently crafted class complaint literally raises common questions"—so what matters is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 349–50. Our Plaintiffs, in other words, must show that common questions—subject to

generalized proof—predominate over individual inquires. *See Avis*, 211 F.3d at 1233 ("That common questions of law or fact predominate over individualized questions means that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." (cleaned up)). They've failed to do that here. The *only* common evidence the Plaintiffs tell us they'll introduce are "[t]he photographs of the Menu Items in the advertisements at issue and photographs of the actual Menu Items as served to customers." Motion at 10. For two reasons, this evidence is insufficient.

*First*, BKC has shown that the proposed class members were exposed to a wide variety of advertisements. In its Response, BKC contends that this "lawsuit puts hundreds of different menu item photos at issue, taken of different hamburgers, at different times, from different angles, in different phases of construction." Response at 7; *see also id.* at 9 ("During discovery, BKC produced to Plaintiffs over a thousand different advertisements disseminated during the putative class period, using hundreds of different food photos."). And BKC has supported this contention by submitting an array of at least 34 different advertisements. *See* Exhibit A to Defendant's Federal Rules of Evidence Objection ("Exh. A to Evidence Obj.") [ECF No. 54-1]. The number of different advertisements BKC disseminated over the class period—coupled with the lack of common evidence about where and when any specific advertisement was displayed (such that we could compare a given representation to the burger the customers who saw that ad received)—strongly suggests that individual issues predominate in this case.

Judges in our District have routinely found that FDUTPA-class certification is inappropriate where (as here) the putative class members were exposed to a wide diversity of advertisements. As Judge Middlebrooks of our Court has explained:

> For multiples reasons, I find that individual issues predominate over common ones. First, it appears that Defendant's website displays trip insurance offers in many different ways. In a declaration attached to Defendant's Motion, an individual employed by the trip insurance provider states that well over 1,000 different offers

have been shown to Defendant's US customers in the Offer Box in Defendant's
booking path. The declaration also states that at any moment in time, about over 40
distinct offers are available to be displayed in the Offer Box on Defendant's website
to US customers. The apparent variability in the offers that consumers see when
purchasing trip insurance demonstrates that individual issues predominate.

*Donoff v. Delta Air Lines, Inc.*, 2020 WL 3268272, at *6 (S.D. Fla. Jan. 24, 2020) (Middlebrooks, J.)

(cleaned up)); *see also Cohen v. Implant Innovations*, 259 F.R.D. 617, 643 (S.D. Fla. 2008) (Lenard, J.)

("[T]he issue of whether each putative class member actually received Defendant's marketing materials

is an individual question of fact critical to each member's claim that predominates over any common

issues of fact.").

Indeed, when we look at cases in which district judges *have* certified FDUTPA classes, we see

that they did so because the class members were exposed to a single (which is to say "common")

representation. *See, e.g.*, *Carriuolo*, 823 F.3d at 986 ("Because every class member here purchased or

leased the same model vehicle *with the same Monroney sticker attached*, it does not matter that there may

have been differences among the class members' subjective reliance." (emphasis added)); *Bowe v. Pub.*

*Storage*, 318 F.R.D. 160, 181 (S.D. Fla. 2015) (Ungaro, J.) ("Public Storage *made the same representations*

to its customers via a standard presentation, and had the same text in its contracts and insurance

addenda; therefore the allegedly deceptive acts are the same as to each class member." (emphasis

added)); *Melton v. Century Arms, Inc.*, 2018 WL 6980713, at *10 (S.D. Fla. Dec. 6, 2018) (Louis, Mag. J.)

("While Plaintiffs are correct in arguing that FDUTPA does not require a showing of reliance,

FDUTPA does require Plaintiffs to show uniformity in causation, meaning that Century's allegedly

deceptive act uniformly caused the putative class members the harm alleged."). We agree with Judge

Middlebrooks that the "apparent variability" in the advertisements our putative class members may

have seen indicates that individual issues predominate here.

We also disagree with the Plaintiffs' assertion that, "[b]ased on the evidence, a jury can find

that BKC's advertisements were uniform across all of BKC's store menu ordering boards." Reply at

16

8. As support for this claim, the Plaintiffs offer a handful of photographs (actually, screenshots from YouTube videos)—mainly of drive-through, menu-ordering boards in Arizona and California from 2021 to 2022. *See* Exhibits 2–11 to the Declaration of James Kelly [ECF Nos. 52-2–11]. But this cherry-picked (and narrow) selection of photographs *doesn't* establish that all (or even most) class members were exposed to these same misrepresentations—in fact, these photos don't even purport to tell us what the putative class members in the other 48 states saw. And, as we've explained, BKC has shown that, over the class period, consumers across the fifty states were exposed to *many different* advertisements. *See* Exh. A to Evidence Obj. Without evidence that the proposed class members were exposed to the same misrepresentations, the Plaintiffs cannot prove—with common evidence—that all class members "suffered from the same injury." *Dukes*, 564 U.S. at 350.[6]

*Second*, the Plaintiffs haven't introduced (or described how they would go about introducing) any class-wide evidence to show that BKC's advertisements *actually* overstated the size of their burgers. The Plaintiffs only tell us that they'll introduce photographs of the Whoppers and Big Kings BKC served to its customers (evidence that's notably absent from the exhibits they've appended to their Motion). But that's not class-wide evidence. As BKC rightly observes, "every sandwich served to a Burger King guest is hand-crafted in a restaurant before being wrapped, potentially placed in a bag,

---

[6] The Plaintiffs try to justify their lack of common evidence by blaming the defense. "BKC," they say, "refuses to produce any documents or information such that Plaintiffs can show what photographs were in place on the menu ordering boards at the various Burger King locations throughout the United States. . . . Plaintiffs have requested a hearing in an effort to compel the production of among other things, 'information sufficient to show where and when the advertisements at issue were approved and distributed to Burger King locations for placement, and when the advertisements were placed on Burger King's website.'" Reply at 6. But the Plaintiffs have had plenty of time to resolve any outstanding discovery disputes with the Defendant. As recently as June 2, 2025, we held a status conference, at which we asked the parties whether there was *anything* we could help them with—and the Plaintiffs never mentioned that BKC was withholding (or had withheld) valuable documents. *See generally* Status Hearing Transcript. Instead, the Plaintiffs raised the issue of their subpoenas for "third-party delivery services." *See id.* at 4. Since the Plaintiffs have no evidence that BKC has withheld the photos of the menu-ordering boards—and given the Plaintiffs' failure to seek court intervention on any such non-production—we won't allow the Plaintiffs to wriggle their way out of their obligation to prove their case.

and perhaps transported from one place to another, leading to wide variations of what it may 'look like' by the time the guest opens and consumes it." Response at 7. No single photograph of a burger, in other words, can represent the appearances of the burgers every *other* class member received. To determine whether any single advertisement was misleading, then, we'd need to compare *that* advertisement to the photographs of the burgers that were purchased by the class members who saw *that* advertisement. That's a highly individualized inquiry.

To understand just how individualized, we need only look at the two Eleventh Circuit cases our Plaintiffs rely on—both of which involved a *single* misrepresentation and class-wide proof of the misleading nature of that representation. *See Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011); *Carriuolo*, 823 F.3d. In *Fitzpatrick*, the plaintiffs showed that General Mills uniformly advertised its product, Yo-Plus, as providing digestive-health benefits to consumers. *See Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 701 (S.D. Fla. 2010) (Huck, J.), *vacated for unrelated reasons*, 635 F.3d 1279 (11th Cir. 2011).[7] To answer the central question in the case—whether General Mills misrepresented Yo-Plus's digestive-health benefits—the Plaintiffs only needed two pieces of evidence: *one*, the representation that Yo-Plus provided certain health benefits ("a common and conspicuous theme found in every Yo–Plus advertisement that the Court has reviewed,"), *id.* at 700; and *two*, scientific evidence that, when subjected to testing, Yo-Plus did *not* in fact produce the promised digestive-health benefits, *see id.* at 697 ("[I]ntegral to the determination of whether General Mills' statements are deceptive under the FDUTPA is the scientifically complex question of whether Yo–Plus does, in fact, work as advertised . . . . The evidence necessary to resolve this question is the same for each plaintiff and therefore common to the class."). As this summation of the Yo-Plus evidence makes plain, the

---

[7] The Eleventh Circuit vacated the district court's order because "the definition of the class it certified was in conflict with [its] analysis." *Fitzpatrick*, 635 F.3d at 1283. Even so, we'll credit the district court's reasoning, which the Eleventh Circuit described as "sound and in accord with federal and state law." *Ibid.* That reasoning, the Circuit said, "is well within the parameters of Rule 23's requirements for certification of a class." *Ibid.*

plaintiffs in *Fitzpatrick* could rely on common, class-wide proof for *both* sides of their evidentiary equation: They had class-wide proof for the defendant's representation on the one hand (the promise that Yo-Plus produced certain health benefits) and class-wide proof for the promise's untruth on the other (the scientific tests, which, according to the defendant, showed that the product *didn't* produce those health benefits).

Our Plaintiffs, by contrast, don't have class-wide proof for *either* side of their evidentiary equation: BKC, as we've said, has made many different promises about the appearances of its burgers (*i.e.*, the many visual depictions that appear on menu boards across the country), and the class members have received burgers in an almost-infinite variety of shapes and sizes. Now, it may be that every single one of those burgers was smaller than every single menu-board item Burger King has ever produced. But that's not the point at the class-certification stage. Here, unlike at trial, the question *isn't* whether the actual burgers the class members received were *smaller* than advertised—the question rather is whether, *as to each individual class member*, the Plaintiffs can prove the relative smallness of the burgers with a few pieces of common evidence that apply with equal force to *everyone*. As we've explained, they *can't* do that because each putative class member will have seen a particular photo and received a specific burger. In some cases, the delta between the purported size and appearance of the advertised burger and the *actual* burger an individual plaintiff received will be larger; in other cases, that delta may be smaller; in a few cases, the delta may be so small as to justify a jury finding that there was no misrepresentation at all. *Cf. Coleman I*, at *8 ("We'll agree with Burger King (of course) that most reasonable people would be unfazed by, say, a one-percent disparity between the amount of food they were offered and the amount they ultimately received—just as (we would think) Burger King would concede that a fifty-percent delta between what was promised and what was sold would probably vex most reasonable consumers."). The point, though, is that the jury will have to make this determination

on a plaintiff-by-plaintiff basis—which, by definition, means that common questions of fact do *not* predominate.

In *Carriuolo*, the plaintiffs (purchasers of 2014 Cadillac CTS cars) were all exposed to the same misrepresentation—a safety sticker, affixed to *all* 2014 Cadillac CTS vehicles, which displayed the various 5-star safety ratings the CTS had supposedly received. *See Carriuolo*, 823 F.3d at 981 ("As it turns out, when these vehicles were sold, General Motors had provided—in the standardized 'Monroney' window stickers that appear on new vehicles—inaccurate safety information."). And the plaintiffs could prove that this representation was false with class-wide evidence because "NHTSA had *not* assigned *any* safety ratings to the 2014 Cadillac CTS at the time of sale to class members." *Ibid.* (emphases added). Again, then, the *Carriuolo* Plaintiffs could establish their class claims with class-wide proof on *both* sides of the evidentiary equation: the safety sticker that appeared on *all* CTS vehicles on the one hand and a letter from NHTSA explaining that NHTSA had assigned the CTS no such safety ratings on the other. Our Plaintiffs, in contrast, haven't shown that they were exposed to a common misrepresentation, and they've failed to describe any class-wide evidence with which they could prove that each putative class member's burger was smaller than it appeared on BKC's ads.[8]

Ultimately, the "burden of proof rests on the party seeking class certification," *Brown*, 817 F.3d at 1233, and the Plaintiffs have failed to show that they can prove their class claims with common evidence.

---

[8] For what it's worth, we reject BKC's position that, to prevail on their FDUTPA claim, the Plaintiffs must show *actual* reliance. *See* Response at 17 ("FDUTPA's causation and damages requirements mean all putative class members must prove individually that they bought hamburgers from Burger King because they saw a photo of the burger before they ordered it and were reasonably misled by the picture into ordering the burger or paying more for it than they would have otherwise."). The Eleventh Circuit has been clear that subjective reliance is *not* an element of a proper FDUTPA claim. *See Fitzpatrick*, 635 F.3d at 1283 ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." (cleaned up)); *see also Carriuolo*, 823 F.3d at 985 ("[A] plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue[.]" (cleaned up)).

## 2.  BKC's Affirmative Defense Raises Individualized Issues

But there are separate predominance issues here. As BKC observes, one of its affirmative defenses *also* cautions against a finding of predominance. *See* Response at 13 ("Although there are many reasons why their motion fails for lack of any truly common legal issues of fact or law, the threat that 'binding arbitration contracts' will 'become a major force of the litigation, and dominate over any ostensible common issues, suffices on its own to warrant denial of class certification." (cleaned up)). BKC has a loyalty rewards program called "Royal Perks." *Ibid.* ("BKC offers a frequent guest reward program called 'Royal Perks,' through which guests earn 'Crowns' for each dollar they spend at Burger King restaurants and can redeem Crowns for free meal items."); *see also* Answer [ECF No. 84] ¶ 3 ("Plaintiffs' claims on behalf of themselves or some or all of the proposed class are barred, in whole or in part, by the terms of BKC's Royal Perks Program."). When BKC customers enroll in that program, they agree to an arbitration clause and a class-action waiver. *Ibid.* ("The terms of service include a broad requirement for arbitration of disputes and a class action waiver."). BKC tells us that "[s]ome 17.8 million people in the United States are Royal Perks members" and that "no one can place an order using the Burger King mobile application without joining Royal Perks and accepting the Terms of Service." *Ibid.* In fact, one of our named Plaintiffs, Anthony Scott, has *already withdrawn* from this case because he'd previously agreed to this same arbitration clause and class-action waiver. *See ibid.* ("Plaintiffs filed a voluntary dismissal of Plaintiff Anthony Scott, explaining that they took this step because he 'used the Burger King mobile application which contains a class action waiver and an agreement to arbitrate all disputes.'" (quoting Declaration of James Kelly [ECF No. 42-1] ¶ 9).

We disagree with BKC's argument that the arbitration clause and class-action waiver *preclude* a finding of predominance. "That some of the class members['] claims may be affected by arbitration agreements does not make class certification inappropriate." *Rosen v. J.M. Auto*, 270 F.R.D. 675, 683 (S.D. Fla. 2009) (Dimitrouleas, J.). Instead, in such circumstances, "it would be more appropriate to

create a subclass rather than deny certification outright."). *Ibid.*; *see also Cardenas v. Toyota Motor Co.*, 2021 WL 6926418, at *22 (S.D. Fla. Aug. 12, 2021) (Louis, Mag. J.) ("[E]ven if the arbitration is ultimately problematic for claims administration purposes, I concur that those with arbitration agreements could either be broken into a subclass or excluded.").

Even so, while the presence of an affirmative defense doesn't (standing alone) preclude a finding of predominance, it *can* provide additional support for a defendant's view that the case presents mostly individualized questions. *See, e.g.*, *Brown*, 817 F.3d at 1241 ("[I]ndividual affirmative defenses can defeat predominance in some circumstances. For example, the affirmative defenses could apply to the vast majority of class members and raise complex, individual questions. Or the affirmative defenses could be coupled with several other individual questions." (cleaned up)); *see also Sacred Heart*, 601 F.3d at 1183 ("[B]eyond the difficulty of managing the variation among the payment provisions and other material terms, the trial court would be required to evaluate significant quantities of individualized extrinsic evidence associated with Humana's affirmative defenses. . . . Under these circumstances, we have little difficulty concluding that the district court's certification of this class was an abuse of discretion."). And that's what we have here.

Not only might BKC's affirmative defense apply to millions of putative class members, but the Plaintiffs also claim that we can administer their proposed class, in part, by identifying potential class members through the "Defendant's online sales records." Motion at 16. As BKC has explained, however, every app purchase (presumably a large percentage of BKC's "online sales records") requires the purchaser to opt *into* the arbitration clause and class-action waiver. *See* Response at 13 ("Importantly, no one can place an order using the Burger King mobile application without joining Royal Perks and accepting the Terms of Service."). The Plaintiffs don't dispute this assertion. In other words, were we to certify the Plaintiffs' proposed class, a potentially significant percentage of the putative class members may be precluded from pursuing their claims in this action. This affirmative

defense thus presents yet another complicated, individualized issue that affects the claims of a large proportion of putative class members—further evidence that common issues of fact do *not* predominate here.

### ii.   The Breach-of-Contract Class

In Florida, "[t]o prevail in a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017).

### 1.   The Plaintiffs Lack Common Evidence

When we allowed the Plaintiffs' breach-of-contract claim to survive BKC's MTDs, we did so because the Plaintiffs had alleged that they actually viewed the menu-board images, interpreted them as offers, and received materially smaller burgers than they believed they had contracted for. *See Coleman I*, at *7. ("And, since the Plaintiffs say that they relied on the information on those store menu ordering boards, we'll accept (for now) those ordering boards as offers."); *see also id.* at *8 ("Ultimately, the Plaintiffs allege that they purchased Burger King products on the expectation that those items would resemble the images on Burger King's store ordering board. They also allege that they received items that were materially smaller than advertised[.]" (cleaned up)); *Coleman II*, *8 ("[O]ur Plaintiffs continue to plausibly allege that the burgers *they* bought were materially smaller than the burgers *they* saw advertised on the menu boards." (emphases added)).

Now at the class-certification stage, however, the critical question becomes whether the Plaintiffs can show that *every* class member entered a materially similar contract with BKC, such that the Plaintiffs can deploy general proof to prove their case. *See Klay*, 382 F.3d at 1263 ("The sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate; this is not a situation in which all plaintiffs signed the same form contract."). For three reasons, we find that the Plaintiffs haven't met that burden. *First*, the Plaintiffs cannot prove *with*

*common evidence* that each proposed class member *saw* the challenged advertisement and considered it an offer. On the contrary, to establish that each class member saw a BKC advertisement, interpreted it as an offer, and then relied on it in a material way, the Plaintiffs would have to call each class member to swear to these facts. That's the *opposite* of common proof. *See Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (holding that the introduction of affidavits in a class action "would require a series of mini-trials" and defeat the purpose of class certification). *Second*, once each class member describes the advertisement he or she interpreted as an offer, the Plaintiffs would have to find and introduce *those specific advertisements*—many of which (as we've discussed) will vary one from the next depending on the state (and the year) in which the burger was purchased. *Third*, each customer will then have to produce *some* individualized evidence (whether a photograph or a recollection) of the burger he or she purchased. As we explained in denying BKC's MTDs, this last piece of evidence is critical to any assessment of the materiality of the contract term because a burger that's only marginally smaller than the advertised product won't constitute a material breach. *See Coleman I*, at *8 ("We'll agree with Burger King (of course) that most reasonable people would be unfazed by, say, a one-percent disparity between the amount of food they were offered and the amount they ultimately received[.]"). On the other hand, a burger that's fifty-percent (or more) smaller than the advertised product probably would. *See ibid.* ("[A] fifty-percent delta between what was promised and what was sold would probably vex most reasonable consumers[.]"). To determine whether any individual class member's burger was materially smaller than advertised, then, *each* class member will need to compare the burger he or she saw advertised to the burger he or she got. Again, this highly individualized inquiry would defeat the purpose of a class action.

### 2.  BKC's Affirmative Defenses May Preclude Much of the Class

As if that weren't enough, BKC has also advanced two affirmative defenses that present individualized issues. Again, while the presence of an affirmative defense cannot (standing alone)

defeat predominance, "individual affirmative defenses can defeat predominance in some circumstances." *Brown*, 817 F.3d at 1241 (citations omitted). And this is one of those circumstances.

We've already discussed the first of these affirmative defenses, which asserts that all members of BKC's rewards program, "Royal Perks," are subject to an arbitration clause and class-action waiver. *See* Answer ¶ 3 ("Plaintiffs' claims on behalf of themselves or some or all of the proposed class are barred, in whole or in part, by the terms of BKC's Royal Perks Program."). For all the reasons we highlighted when we discussed this affirmative defense in the context of the Plaintiffs' proposed FDUTPA class, *see supra* § I.b.i.2., this defense would require us to engage in highly individualized inquiries: assessing, in each class member's case, whether he or she in fact entered into a valid and enforceable class-action waiver. Since this side exercise would be extremely time-consuming, individualized, and laborious, the presence of this affirmative defense again militates against the Plaintiffs' class-certification request.

BKC's second problematic affirmative defense, is that: "Plaintiffs' breach of contract claims on behalf of themselves or some or all of the proposed class are barred because Plaintiffs or proposed class members did not properly notify BKC of the alleged breaches within a reasonable time after Plaintiffs or proposed class members discovered or should have discovered the alleged breaches, as required under applicable state law." Answer ¶ 8. Under Florida Law, "where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." *Sacred Heart*, 601 F.3d at 1181 (quoting *Acosta v. Dist. Bd. of Trs. of Miami–Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. Dist. Ct. App. 2005) (cleaned up)). So even if we assume that *every* class member based his or her purchasing decision on the size and appearance of the burger he (or she) saw on the menu boards, we must still ask each class member whether, having come all that way for a burger, he (or she) acquiesced to the "altered" contract terms and ate the burger without complaint.

We have no idea how many class members fit this description—the parties obviously have no idea—but we don't think we're going out on a limb when we say that this affirmative defense very likely affects an enormous percentage of the claims. To resolve this affirmative defense, after all, we'll need to ask *all* class members individualized questions about what they did with the allegedly smaller burgers when they received them. *See Sacred Heart*, 601 F.3d at 1183 ("[B]eyond the difficulty of managing the variation among the payment provisions and other material terms, the trial court would be required to evaluate significant quantities of individualized extrinsic evidence associated with Humana's affirmative defenses. . . . Under these circumstances, we have little difficulty concluding that the district court's certification of this class was an abuse of discretion."). And that, in turn, means that our putative class claims implicate *yet another* individualized question.

***

For all these reasons, we decline to certify the Plaintiffs' proposed breach-of-contract class.

### iii.   The Unjust-Enrichment Class

In Florida, "the essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (cleaned up). It's well established that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts," because "before it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Simmons v. Ford Motor Co.*, 592 F. Supp. 3d 1262, 1296 (S.D. Fla. 2022) (Ruiz, J.) (quoting *Vega*, 563 F.3d at 1267). Because of the "individualized equities attendant to each class member, courts,

26

including the Eleventh Circuit, have found unjust enrichment claims inappropriate for class action treatment." *Ibid.* (quoting *Vega*, 563 F.3d at 1267).

In our case, the Plaintiffs' unjust-enrichment and breach-of-contract claims trigger the very same individualized inquiries because "the facts necessary to support the two types of claims are almost identical." *Klay*, 382 F.3d at 1267. Indeed, the Plaintiffs' unjust-enrichment claim would require *even more* individualized inquiries because we'd need to examine "the particular circumstances" of each claim to determine whether, "without a remedy, inequity would result or persist." *Vega*, 563 F.3d at 1267. And, on this point, the record suggests that the circumstances of each class member vary greatly. For example, the Plaintiffs' interrogatory responses identify at least one named Plaintiff as a repeat BKC customer. *See* Exhibit A to the Declaration of Jeffrey Jacobson ("Jacobson Decl.") [ECF No. 49-4] at 22–23 ("Plaintiff does not recall the specific dates of purchases but states that she has purchased Whoppers from Burger King approximately one dozen times over the course of the past few years."). How could it be unjust for BKC to retain the benefit it received (cash) from customers who *repeatedly* frequented their establishments—and who thus knew *exactly* what they were buying? And what about customers who ate their burgers? How would it be unjust for BKC to retain the payment it received from customers who got what they bargained for—a quick, cheap meal? Because these questions strike at the core of the Plaintiffs' unjust-enrichment claim, we refuse to certify an unjust-enrichment class.

### c.  Damages

Under Rule 23(b)(3), plaintiffs bear the burden of "establishing that damages are capable of measurement on a classwide basis" *Comcast Corp.*, 569 U.S. at 35. The general rule in the Eleventh Circuit is that the "presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 936 (11th Cir. 2016) (citing *Allapattah Servs., Inc.*, 333 F.3d at 1261 (cleaned up)). But this rule is subject to

several exceptions. "For example, individual damages defeat predominance if computing them 'will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.' Furthermore, individual damages defeat predominance when they are accompanied by 'significant individualized questions going to liability.'" *Brown*, 817 F.3d at 1240 (quoting *Klay*, 382 F.3d at 1260); *see also Simmons*, 592 F. Supp. 3d at 1295 ("[A] plaintiff must actually demonstrate, through evidentiary proof, that class-wide damages are capable of measurement, not simply assert that it is so." (cleaned up)). Both exceptions apply here.

> The Plaintiffs have proposed the following damages calculation:
>
> The simple calculation of the benefit of the bargain damages is the approximate price paid by consumers for the Menu Items, which is the value, less the percentage of the value by which the jury finds that the Menu Items were overstated. For example, if the jury finds that BKC materially overstated a Menu Item in its advertisements by 35%, damages for said Menu Item can be fairly measured at 35% of the approximate price that class members paid for the Menu Item.

Motion at 19. To help us along, the Plaintiffs tell us that "[t]he price that BKC charges for the Menu Items are publicly available on its website or mobile ordering application" and that "[h]istorical pricing information from BKC's website is available through the Internet Archive, located at https://archive.org/." *Id.* at 19–20.

Three problems with this. *First*, a cursory review of BKC's public website shows that the prices of BKC's menu items vary by location. *See* Burger King's Website, https://www.bk.com/.[9] As to each class member, then, we'd have to determine *where* he or she bought the burger *before* we can accurately calculate damages. *Second*, the proposed class stretches from "April 1, 2018 to the final disposition of this action"—a period of more than seven years, during which BKC's prices undoubtedly waxed and

---

[9] We *may* take judicial notice of BKC's website under Rule 201 of the Federal Rules of Evidence "on [our] own," but we *must* "take judicial notice if a party requests it and the court is supplied with the necessary information." *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014) (citing FED. R. EVID. 201(c)). Here, *the Plaintiffs* have directed us to BKC's "publicly available website" in support of their claim that damages can be calculated on a class-wide basis, Motion at 19—so we've reviewed the website for that purpose.

waned. Motion at 9. Again, as to each class member, we'd have to confirm exactly *when* he or she bought the burger and determine what the price of the burger was at that particular location and on that particular day *before* we could compute his or her damages. And the Plaintiffs' suggestion that we could simplify all this by using the "Internet Archive" is absurd. *Id.* at 20. For one thing, there's no evidence that any such prior, relevant, iterations of BKC's website even exist on the Internet Archive. For another, even if we could find every previous iteration of BKC's website, the Plaintiffs have made no attempt to show that sifting through thousands of archived webpages for pricing information is even possible—much less feasible. For yet another, even if we could easily manipulate the Internet Archive to determine what the price of a given burger was on a specific date, we'd still need *every* class member to tell us when and where he or she bought a burger so that we could hunt for all those dates and locations in the archive—an arduous, time-consuming, and especially individualized set of tasks. *Third*, the Plaintiffs haven't explained *how* a jury could find that any specific menu item (once received by the consumer) was "overstated by 35%"—or by any other percentage. As we've highlighted elsewhere, the only burger-size evidence the Plaintiffs have adduced over months of protracted discovery are cherry-picked photos they've plucked from the internet. *See* Complaint at 3, 6. Depending on many different factors—including the angle at which the photo was taken, the positioning of the patty within the bun, the extent to which the burger is tucked into the sandwich bag, and the amount of lettuce, tomato, and onion on the burger—these photos show burgers that appear quite different one from the other. So, whereas we might say that one burger looks like it might be thirty-percent smaller than a given advertisement, some other burger might look only five-percent smaller—and so on. The Plaintiffs' lack of common, class-wide evidence thus makes it impossible for the fact-finder to calculate the Plaintiffs' alleged damages by the application of a consistent "overstatement percentage."

Alternatively, the Plaintiffs suggest that we calculate their damages as "a percentage of the approximate price that BKC charges consumers for an additional beef patty," reasoning that, "if the jury finds that the advertisement for the particular Menu Item overstated the beef patty by 50%, then the damages would be 50% of the cost to the consumer of adding another beef patty to the Menu Item." *Id.* at 20. But this method just combines the problems of the first two. For one thing, again, there's no such thing as a standard burger price from 2018 to the present. Every class member will still have to tell us where and on what day he or she bought the burger before we can compute the price of an extra patty. For another, there's no such thing as a common "overstatement percentage." To determine whether—and by how much—each patty was smaller than the advertised burger, each class member would need to compare the specific burger he or she received to the specific advertisement he or she saw. That's tremendously unwieldy.

This extremely individualized damages analysis—when combined with the other individualized issues we've identified already—prevents us from concluding that the Plaintiffs have "establish[ed] that damages are capable of measurement on a classwide basis." *Comcast Corp.*, 569 U.S. at 35.

### d.  Superiority

For all the reasons we've outlined—and a few more we'll discuss below—the Plaintiffs' proposed classes *also* don't satisfy Rule 23(b)(3)'s superiority requirement. *See* Fed. R. Civ. P. 23(b) ("One or more members of a class may sue or be sued as representative parties on behalf of all members only if: . . . the court finds that . . . that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."). In assessing whether the proposed class action would be "superior to other available methods," *Sacred Heart*, 601 F.3d at 1169 (citing Fed. R. Civ. P. 23(b)(3)), we must consider the four factors enumerated in Rule 23(b)(3)(A)–(D):

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)–(D). Of course, "the lack of predominance belies any suggestion that a

fair administration of the class claims could save the resources of both the court and the parties."

*Sacred Heart*, 601 F.3d at 1184 (cleaned up). The Plaintiffs have likely satisfied the first three of these

factors: (1) the absent class members will have little incentive to pursue their own claims given how

small each consumer's damages are likely to be, *see* FED. R. CIV. P. 23(b)(3)(A); (2) we're not aware of

any related case by or against the class members, *see* FED. R. CIV. P. 23(b)(3)(B); and (3) our Court

seems like an effective forum for these claims, *see* FED. R. CIV. P. 23(b)(3)(C). Even so, the Plaintiffs

fall well short on the final factor—"the likely difficulties in managing a class action." FED. R. CIV. P.

23(b)(3)(D).

On this final factor, the Plaintiffs say very little: "Finally," they write, "there are no significant

or unusual difficulties in managing this case. BKC's liability can be proven by its uniform

advertisements and photographs of the actual Menu Items served to customers, which are common

to the entire class." Motion at 21. In BKC's view, however, the proposed class isn't administratively

feasible. *See* Response at 25 ("[A]dministrative feasibility of determining class membership must be

considered as part of the superiority analysis." (citing *Cherry*, 986 F.3d at 1304)).[10] And we agree that

the Plaintiffs' proposed class would create an administrative nightmare.

The proposed class involves millions of consumers, stretching back to 2018—very few of

whom are likely to have retained proof of (or even remember) their fast-food purchases. The Plaintiffs

insist that we can identify class members by reviewing the "Defendant's online sales records, third-

---

[10] BKC misstates *Cherry's* holding. In *Cherry*, the Eleventh Circuit held that "administrative feasibility
is not a requirement for certification under Rule 23," but added that, "[i]f a district court reaches Rule
23(b), and the action involves a proposed Rule 23(b)(3) class, it *may* consider administrative feasibility
as part of the manageability criterion of Rule 23(b)(3)(D)." *Cherry*, 986 F.3d at 1304 (emphasis added).

party delivery service data, and potential class members' affidavits." Motion at 22. All three of these proposed methods suffer from serious flaws. *First*, BKC's online sales records likely reflect only a small portion of BKC's overall sales, *see* Response at 25 ("[S]uch purchases account for only a small fraction of the total"), *and* online purchasers who used BKC's mobile application may well be precluded from joining this action, *see* Response at 13 ("[N]o one can place an order using the Burger King mobile application without joining Royal Perks and accepting the [arbitration clause and class action waiver]."). *Second*, when a consumer buys a food item from a third-party delivery service, that consumer must expect some amount of variability in the appearance of the food when it's delivered—either because of the lapse of time, because it was sandwiched between other food items, or because it was jostled in transit. That high degree of variability thus renders the claims of these consumers particularly inappropriate for class certification—both because their burgers will differ from the burgers of other third-party-delivery consumers and (it goes without saying) because they'll differ from the burgers their fellow class members bought *inside* BKC stores. Worse, customers who used third-party-delivery services *weren't* exposed to BKC's menu boards. That's a big problem because the Plaintiffs' alleged reliance on the "offers" BKC made to in-store customers through its in-store menu boards is the *only* aspect of the Plaintiffs' breach-of-contract claim that survived BKC's first MTD. *See Coleman I*, at *8 ("Ultimately, the Plaintiffs allege that they purchased Burger King products on the expectation that those items would resemble *the images on Burger King's store ordering board*. They also allege that they received items that were materially smaller than advertised, and that they wouldn't have purchased those items had they known their true size. That's enough for now." (cleaned up & emphasis added)); *see also ibid.* ("[W]e'll preclude the Plaintiffs from arguing that Burger King's TV and online ads constituted actionable offers."). *Third*, the Plaintiffs' suggestion that class members self-identify via affidavits would result in a series of "mini-trials, defeating the purpose of class-action

treatment." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 685 (S.D. Fla. 2014) (Bloom, J.) (cleaned up).[11] As the Eleventh Circuit has explained:

> The potential problems with self-identification-based ascertainment are intertwined. On the one hand, allowing class members to self-identify without affording defendants the opportunity to challenge class membership provides inadequate procedural protection to defendants and implicates their due process rights. On the other hand, protecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a series of mini-trials just to evaluate the threshold issue of which persons are class members.

*Karhu*, 621 F. App'x at 948–49 (cleaned up). We won't, in sum, build a class that requires thousands or even millions of class members to self-identify via affidavit.

The Plaintiffs, in short, have failed to satisfy the superiority requirement of Rule 23(b)(3).

## II.       Rule 23(a) – Commonality

Although this finding—that the Plaintiffs have failed to satisfy Rule 23(b)(3)—is sufficient for us to deny the Plaintiffs' class-certification request, in the interest of completeness, we'll also explain why they haven't met their burden under Rule 23(a).[12]

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A plaintiff must show that the class members "have suffered from the same injury" and that "[t]heir claims must depend on a common contention." *Dukes*, 564 U.S. at 350. "That

---

[11] Trying to distinguish *Randolph*, the Plaintiffs say that, "[i]n *Randolph*, there were at least nine different Crisco oils on the market, only four of which were the subject of that case. Beyond that, even among those four oils, the allegedly deceptive label being challenged was not placed on all four oils uniformly throughout the class period." Reply at 12 (cleaned up). But that misses the point. As the Eleventh Circuit explained in *Karhu*, allowing a significant proportion of class members to self-identify via affidavits would implicate serious due-process concerns stemming from the defendant's inability to challenge each identification in open court. 621 F. App'x at 948–49. We also disagree with the Plaintiffs that "there is no indication that a consumer would not recall the specific BKC menu item that was purchased or the approximate time frame," *ibid.*—a claim belied by the Plaintiffs' *own* interrogatory responses, *see, e.g.*, Exhibit A to the Jacobson Decl. at 22–23 ("Plaintiff does not recall the specific dates of purchases but states that she has purchased Whoppers from Burger King approximately one dozen times over the course of the past few years.").

[12] Still, because the Plaintiffs haven't made a sufficient showing of commonality, we needn't reach the parties' arguments on the *remaining* elements of Rule 23(a).

common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ibid.*

The Plaintiffs try to identify several such common questions. *See* Motion at 12 ("Commonality is met here by common questions of law and fact, including: Whether BKC's advertisements for the Menu Items are materially misleading; Whether the beef patties that BKC uses in its advertisements are materially larger than the beef patties that are actually served to customers; Whether BKC's advertisements display a materially greater amount of ingredients than are actually served to customers; Whether the average customer was likely to be misled by Burger King's advertisements for the Menu Items; Whether Burger King was unjustly enriched by the advertisements for the Menu Items; and Whether Plaintiffs and the class have sustained damages and/or are entitled to restitution as a result of Burger King's advertisements for the Menu Items."). As we've said, however, "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes* 564 U.S. at 350 (cleaned up).

For all the reasons we described in our analysis above, *see supra* § I.a.–b., the Plaintiffs have failed to show that the common questions they've raised can be resolved through class-wide evidence—so they haven't satisfied Rule 23(a)'s commonality requirement. *See Vega*, 564 F.3d at 1272 ("Vega has not shown commonality under a breach of contract theory because he has not alleged in his complaint the existence of a common contract under which T–Mobile employed all class members. As such, he could not utilize identical evidence on behalf of every member of the class to prove offer, acceptance, consideration, or the essential terms."); *see also Ohio State Troopers Ass'n, Inc.*, 2021 WL 4427772, at *2 (11th Cir. 2021) ("Appellants offered no common evidence capable of showing a uniform classwide defect at the time of sale. Appellants thus haven't met their burden under Rule

34

23(a)(2) of demonstrating that there are questions of fact or law common to the class that have the capacity to 'generate common answers' and are 'capable of 'classwide resolution.'" (quoting *Dukes*, 564 U.S. at 350).

While the predominance inquiry is "far more demanding than Rule 23(a)'s commonality requirement," *Vega*, 564 F.3d at 1270, the Plaintiffs' inability to resolve the key issues in this case through the use of class-wide evidence is fatal to both, *see Dukes*, 564 U.S. at 350 ("[C]ommon contention[s] [ ] must be of such a nature that [they are] capable of classwide resolution.")

\*\*\*

After a careful review of the parties' filings, the record, and the governing law, we **ORDER and ADJUDGE** that the Plaintiffs' Motion for Class Certification [ECF No. 44] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on November 25, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record